JOEL AND ANN URANGA, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Uranga v. Commissioner
Docket Nos. 6441-80, 9483-80.
United States Tax Court
T.C. Memo 1983-373; 1983 Tax Ct. Memo LEXIS 420; 46 T.C.M. (CCH) 567; T.C.M. (RIA) 83373; June 22, 1983. Towner Leeper and David Leeper, for the petitioners. John F. Eiman,David W. Johnson, and Sheri A. Wilcox, for the respondent. GOFFE
MEMORANDUM FINDING OF FACTS AND OPINION GOFFE, Judge: In these consolidated cases, the Commissioner determined deficiencies in petitioners' Federal income taxes as follows: Year
Deficiency
1974
$173,203.50
1975
119,764.70
1976
52,303.00
The issues for decision are (1) whether advances to Joel Uranga and Chateau Le Grande *421 Apartments from Paso Del Norte Oil Company, Inc., during the taxable years 1974, 1975, and 1976 in the amounts of $237,397, $124,711, and $194,268, respectively, constitute taxable distributions; (2) whether payments of petitioners' personal expenses during the taxable years 1974 and 1975 in the amounts of $98,162.52 and $129,409.80, respectively, by Paso Del Norte Oil Company constitute taxable distributions; and (3) whether the Commissioner abandoned his original determination by issuing a subsequent statutory notice which adopted a position inconsistent with his position in prior statutory notices. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporate herein by this reference. The petitioners, Joel and Ann Uranga, husband and wife, resided in El Paso, Texas, during the taxable years in issue. All references to petitioner in the singular will refer to Joel Uranga since it is his business dealings with which we are concerned. From 1967 to 1978, petitioner was principal shareholder, president, and operating manager of Paso Del Norte Oil Company, Inc. (Paso). Paso was a corporation *422 primarily engaged in wholesale butane-propane gathering. It transported liquefied petroleum (LP) gases into the El Paso area and then distributed them for use as fuel throughout Mexico and Latin America. Later, Paso expanded into retail and for this purpose formed a subsidiary, the Texas Energy Company. During the period of petitioner's ownership, average sales were between $15-17 million. For the taxable years in issue Paso did not declare or pay any formal dividends, nor did petitioners report any dividend income from Paso. Paso reported taxable income on its Federal corporate income tax returns as follows: FYE Sept. 30
Amount
1974
$176,760.22 1975
32,724.00 1976
(397,517.00)
1977
(634,464.00)
1978
(839,899.00)
Paso sustained net operating losses of: FYE Sept. 30
Amount
1976
$397,517
1977
461,676
1978
521,285
Paso had retained earnings, exclusive of dividends, of: FYE Sept. 30
Amount
1974
$346,040
1975
488,569
1976
Petitioner received a salary from paso of: Petitioner's
Taxable year
Amount
1974
$53,400
1975
83,000
1976
72,000
Petitioners owned the Chateau Le Grande *423 Apartments, located in Houston, Texas, from April 1973 to June 1976. These were rental apartments for which the petitioners reported the income and claimed the deductions on their individual income tax returns for the taxable years in issue. In 1976 petitioner applied for a $2 million bank loan to Paso on which he would become personally obligated. A letter from the bank dated May 27, 1976, discussed, interalia, one condition of the loan which was that petitioner sell Chateau Le Grande Apartments and pay the proceeds to Paso "to be applied against [his] obligation to the corporation." The letter also made reference to petitioner's agreement that he would immediately begin liquidating assets to "pay off [his] personal debt and apply the proceeds of these debts to the note to the corporation." It appears from the record that this was not done. Nor is it clear whether the money which he sought from the bank at that time was actually borrowed. Paso had advanced funds, the nature of which is in issue, directly to petitioner for his personal use as follows: 1974
1975
1976
Total
$237,397
$124,711
$194,268
$556,376
Paso also advanced $54,215 *424 to petitioner during the fiscal year ending September 30, 1977. Paso's books and records reflected balances of accounts receivable from Joel Uranga and Chateau Le Grande Apartments as follows: 1973
1974
1975
1976
Joel Uranga
$13,769.39
$220,152.11
$294,451.31
$488,719.00
Chateau
31,014.00
81,426.41
81,426.41
Le Grande
Petitioner issued at least one promissory demand note to Paso for $187,251.17. It was due and payable on or before September 30, 1976, but petitioner did not attempt to repay it. He may have issued additional promissory notes, but payments of principal or interest were never made on any of the other advances. On May 23, 1978, subsequent to the events before us, petitioner sold his stock in Paso. He had a cost basis of $35,000 in this stock. He never saw his promissory note to Paso after the sale, nor would he have seen any others if they were issued, because they would have been transferred to the new owners with all other Paso records. On November 2, 1978, Paso filed a petition under Chapter XI of the Bankruptcy Act. In its original Petition for Bankruptcy, Paso listed as an asset certain advances to petitioner *425 in the amount of $551,275.27 with the following explanation: The loans in the amount of $551,275.27 represent funds advanced to Joel Uranga as sole owner of Paso Del Norte Oil Company. We have been advised by prior management that Joel Uranga has signed two notes aggregating this amount, however, we have been unable to located said notes to date. On November 15, 1978, unsecured creditors of Paso filed a motion in the bankruptcy proceeding in which they sought to transfer the proceeding to a Chapter X action, asserting, among other things, that no action had been taken to collect "a sum in excess of $550,000" from Joel Uranga. On February 1, 1979, the Debtor in Possession and the creditors did reach a settlement wherein the bankruptcy proceedings would remain under Chapter XI. At that time, however, no action was taken with regard to any claims against petitioner and his wife. On September 4, 1980, Paso commenced an action in State court against Joel Uranga to collect on a promissory note in the amount of $187,251.17 bearing 8-percent interest. Petitioners asserted in defense of this lawsuit that, as consideration for the sale of their Paso stock on May 23, 1978, they received *426 $5,000 cash and a release of all their indebtedness to Paso. Petitioners, however, reported only the $5,000 on their individual income tax return for the year of the sale. An unaudited financial statement prepared by an accounting firm on June 30, 1975, showed accounts receivable on the books of Paso of $237,755 from Joel Uranga and $48,110 from Chateau Le Grande Apartments. For taxable year ended September 30, 1976, the accounting firm, then known as Haskins & Sells, indicated in a letter the need for funds, stating "* * * continuation of the Company's operation is contingent upon maintaining the availability of funds under existing credit arrangements and upon obtaining such additional financing as will be required * * *." The audit statement for fiscal year ending September 30, 1977, stated: The Company has made advances to its sole shareholder at September 30, 1977 and 1976 of $537,934 and $483,719, respectively. Because these advances are deemed to be uncollectible as of September 30, 1977, the-above mentioned amounts are included in shareholder's deficiency in the accompanying financial statements, resulting in a restatement of the 1976 balance sheet. On its income *427 tax returns for 1977, also prepared by Haskins & Sells, Paso recorded the advances to Joel Uranga as assets of the corporation--"Loans to stockholders $537,934." Petitioner sold his stock on May 23, 1978. Approximately three months later, the Internal Revenue Service audited Paso's income tax returns for fiscal years ended September 30, 1974 and 1975 and required Paso to accrue as additional income, the interest on petitioner's notes. Paso agreed to this adjustment and waived restrictions on assessment of the tax based upon this and other adjustments. The Commissioner computed dividend income based upon petitioner's receipt of these advances as follows: Loans to Stockholders
1973
1974
1975
Joel Uranga -
Balance 12/31
$13,769
$220,152 $294,451 Chateau Le Grande -
Balance 12/31
31,014 81,426 Total
$13,769
$251,166 $375,877 Balance Prior Year
(13,769)
(251,166)
Dividends to Shareholder
$237,397 $124,711 During taxable years 1974 and 1975, Paso paid travel expenses in the amounts of $4,850 and $1,000, respectively, for Joel Uranga's travel to the following places: Date
Place of Travel
Amount
1/2/74
Washington, D.C.
$ 300
1/22/74
Oklahoma City
150
1/29/74
Houston-Tulsa
350
3/22/74
Mexico City
500
4/19/74
George Huffman
200
5/4/74
Chicago
200
9/11/74
Los Angeles
200
10/18/74
Unknown
500
11/29/74
Mexico City
2,000
12/11/74
Houston
200
12/21/74
Unknown
250
Total 1974
$4,850
*428 Date
Place of Travel
Amount
1/2/75
Unknown
$ 100
1/15/75
Unknown
250
1/17/75
Unknown
300
1/27/75
Mexico City
150
9/75
Unknown
200
Total 1975
$1,000
These amounts included taxi fares and hotel bills. One commercial airline trip to Washington involved a meeting with the Federal Energy Administration (FEA) during which time a number of El Paso gas company representatives and their wives were invited to Washington to discuss gas allocation with William P. Lazarus, then Undersecretary of FEA. This was the only trip in issue where petitioner's wife accompanied him and it was because of an express invitation by the Undersecretary. Another airline trip to Houston was for the purpose of meeting with Gulf, Shell, and Petrolane who were suppliers and occasional Paso customers. The third commercial airline flight was to Tulsa also for the purpose of meeting with representatives from Cities Service Oil Company, Warren Petroleum, and Northern Natural Gas. Paso purchased gas from these companies for the pipeline but also sold them gas, so many clients were both suppliers and customers. Petitioner traveled to Mexico City which was the headquarters *429 of Pemex or Petroleos Mexicanos, the Mexican government's oil industry with which petitioner had annual or semi-annual contracts to deliver gas on a monthly basis. Another trip to Chicago was to attend the National LP Gas Convention. There also were expenses for six trips to unknown destinations. George Huffman was the co-pilot of the company jet. Paso purchased a jet for $164,744.34 and a Cessna 421 for $385,000. During taxable years 1974 and 1975, Paso made payments of $96,173 and $104,916, respectively, for the two aircraft. The jet was used primarily for long distance travel; the Cessna was used by executives of the Texas Energy Company to fly to many rural districts in Texas that needed weekly or monthly supervision. Most of these places such as Plainview, Dimmett, Lockney, Spur, Munday, Eagle Pass, and Turkey were not connected by commercial flights. There were approximately 17 such cities in West Texas. During the same taxable years, Paso also expended $47,861.43 and $50,226,60, respectively, for operating expenses for the airplanes, and paid $1,608 and $1,632, respectively, for insurance premiums. The use of the aircraft was 52 percent business and 48 percent personal. *430 In September 1974 petitioner purchased a yacht named Pegasus for $85,000. The sales agreement and insurance policy bear the names of petitioner and his wife. The sales agreement states that the boat will not be used primarily for business or commercial purposes. During 1974 and 1975, Paso made the following expenditures with respect to the boat: Expenditure
1974
1975
Downpayment
$17,000
Monthly Payments
3,852
$11,556
Operating Expenses
1,396
42,490
Total
$22,248
$54,046
Paso paid $1,320 in insurance premiums during 1975 for the boat. The boat was used to entertain suppliers of Paso. In 1974 the expenses of a slip maintenance and captain were $1,396. In 1975, $2,400 was spent repairing the boat, and the captain's salary was approximately $14,400 to $18,000. Paso claimed as a deduction on its books and records and Federal income tax return for fiscal year ended September 30, 1975, $500 as "officers' expenses" for contributions to an El Paso mayoral candidate supported by petitioners. This payment was made by a vice president of Paso, and without petitioner's knowledge. Paso paid legal expenses to Paso counsel, Steven Tredennick, of $320 *431 and $640 during 1974 and 1975, respectively. This attorney represented petitioner on personal matters involving real estate in 1974 and 1975. The Commissioner computed petitioner's dividend income based upon the above-described payments as follows: Disbursements and Expenses
Paid on your Behalf
1974
1975
Legal and Audit
$ 320.00
$ 640.00
Travel and Entertainment
4,850.00
1,000.00
Airplane
69,136.52
70,271.80
Boat
22,248.00
54,046.00
Insurance
1,608.00
2,952.00
Officers Expenses
500.00
Total
$98,162.52
$129,409.80
During taxable year 1974, Joel Uranga Enterprises, a sole proprietorship of the petitioner's, recorded a net loss of $12,156; Transportes Pan Americana, another sole proprietorship, recorded a net loss of $13,106; and petitioner's rental properties recorded a net loss of $47,770.30. Petitioner purchased office furniture and equipment for $5,396 for Joel Uranga Enterprises, seven tank cars for $33,115 for Transportes Pan Americana, and rental property in El Paso for $32,000 during the taxable year 1974. He also purchased furniture and fixtures for Chateau Le Grande Apartments in the amount of $9,427. During 1975, petitioner *432 expended an additional $29,911 for furniture, fixtures, and improvements at Chateau Le Grande Apartments. Petitioner contributed all assets and liabilities of the two sole proprietorships to Paso during fiscal year ending June 30, 1975. After this case was tried on January 4, 1982, petitioner received a statutory notice of deficiency for taxable year 1978. In this statutory notice the Commissioner determined deficiencies and gave the following explanations: It is determined that you received unreported taxable income from the discharge of indebtedness owed to Paso Del Norte Oil Company, in the amount of $551,275.27, during the taxable year 1978. Accordingly, your taxable income for 1978 is increased $551,275.27. In the alternative, the notice provided: * * * if it is subsequently determined that you did not receive unreported taxable income from the discharge of indebtedness owed to Paso Del Norte Oil Company in the amount of $551,275.27, during the taxable year 1978, it is determined that your capital gain (loss) less Internal Revenue Code section 1202, deduction for taxable year 1978 is $260,972.64, instead of $ (3,000,00) [sic], as reported *433 by you * * *. OPINION The first issue for decision is whether cash distributions to petitioner by his wholly owned corporation, for his personal use, constitute taxable dividends or bona fide loans. Whether such amounts are dividends or loans is a question of fact which must be resolved in light of all the facts and circumstances surrounding the transaction. [1] See John Kelley Co. v. Commissioner,326 U.S. 521 (1946). The petitioners have the burden of proving that the withdrawals were intended to be loans to them. Rule 142(a), Tax Court Rules of Practice and Procedure; [2]Welch v. Helvering,290 U.S. 111 (1933). *434 While there is no fixed rule for distinguishing dividends from loans, some generally applicable criteria are available to guide us in resolving this question of what the parties really intended at the time they entered into the transaction. See, e.g., Williams v. Commissioner,627 F.2d 1032 (10th Cir. 1980), affg. a Memorandum Opinion of this Court; Berthold v. Commissioner,404 F.2d 119, 122 (6th Cir. 1968), affg. a Memorandum Opinion of this Court; Chism's Estate v. Commissioner,322 F.2d 956 (9th Cir. 1963), affg. a Memorandum Opinion of this Court. The factors considered by the courts include: the extent of stockholder control, the dividend history of the corporation, the magnitude of the advances, the presence or absence of conventional indicia of debt, the treatment of advances in the corporate financial statements, authorization by the corporation, the pledging of collateral as security, the payment of interest, and the ultimate repayment of the amounts withdrawn; but no single factor is determinative. "Whether a withdrawal is *435 a loan is a factual question * * * and depends upon the existence of an intent at the time the withdrawal is made that it should be paid back." Clark v. Commissioner,266 F.2d 698, 710-711 (9th Cir. 1959). When the advances are made to one who is in substantial control of the corporation, such control invites special scrutiny of the transaction. Baird v. Commissioner,25 T.C. 387, 393 (1955). In Wiese v. Commissioner,93 F.2d 921 (8th Cir. 1938), the Court of Appeals phrased the issues as whether withdrawals: * * * by the sole owner of the stock of a corporation * * * are to be considered income to the stockholder for the years in which the withdrawals were made, or * * * when the charges against the stockholder were cancelled on the books of the corporation. [93 F.2d at 921.] Petitioner's primary argument is that the fact that he was sued on the notes in 1978 proves they really existed during the taxable years in issue and, therefore, that he must have intended to repay them. As support for this position, petitioner points to the notes being listed on corporate financial statements in 1975, 1976, and 1977 *436 and on corporate tax returns. He also introduced a letter in which a bank acknowledged his acknowledgment of the debts in 1976 when petitioner was trying to borrow money to keep his corporation afloat. In Wiese v. Commissioner,supra at 922, the Court of Appeals set forth the legal principle that when the principal shareholder makes a permanent withdrawal of funds from his corporation, he is deemed to have received income at the time of withdrawal even though the formalities of a dividend distribution have not been observed and the payment is recorded on the books as a loan. So in applying the correct test, the relevant factual enquiry is whether the withdrawals were in fact loans at the time they were paid out. In Wiese v. Commissioner, the Court of Appeals also noted: It is important that courts do not go too far in relieving the taxpayer of his burden of proof in cases such as this, where both the facts and the evidence are peculiarly subject to the control and knowledge of the taxpayer. [93 F.2d at 923.] Conspicuously lacking, in the *437 instant case, is any evidence of petitioner's intent to repay the amounts advanced during the taxable years in issue. Only one note was offered by petitioner. He paid no interest or principal on that alleged indebtedness or on any of the other advances. Petitioner's claim that he intended to pay back the money, considered with the fact that the advances were reflected on corporate financial statements beginning in 1975, is not persuasive. What is clear, is that petitioner continued to withdraw funds for his personal use after it became apparent that Paso was beginning to go under. In 1977 the auditor had declared petitioner's 1976 advance uncollectible, but petitioner still withdrew more cash in fiscal year ending September 30, 1977. At first blush, the letter from the bank in which petitioner purportedly agreed to liquidate assets and begin paying off his obligation might seem persuasive. But the record indicates that none of this was done and it is not clear that the money was subsequently borrowed. Furthermore, this action would not persuade us of an intent to repay the advances because by May 1976 the corporation was already in financial trouble. Further evidence of *438 lacking intent to repay is found in the fact that, when petitioner bailed out in 1978, he reported only $5,000 and none of the income from the release of indebtedness he claims to have received as consideration for the sale of his stock. Nor is the subsequent suit for collection or the bankruptcy proceeding persuasive of petitioner's intent during the taxable years in issue. There were no attempts to enforce repayment while petitioner was in control of the corporation. Likewise, the settlement between the Internal Revenue Service and Paso as to the interest income is not persuasive. There are numerous reasons why the corporation would make such a settlement and prefer to have the advances classified as promissory notes at that point in time. Petitioner has failed to meet his burden of proving that he intended to repay the advances. We conclude, therefore, that the amounts so advanced by Paso to petitioner constituted constructive dividends. The second issue for our decision is whether petitioner received taxable distributions from Paso through payment of personal expenses during taxable years 1974 and 1975 in the amounts of $98,162.52 and $129,409.80, respectively. The parties *439 have stipulated that Paso paid certain amounts for Joel Uranga's travel, for two aircraft, a boat, legal fees, and a campaign contribution. Respondent argues that these amounts constitute constructive dividends from Paso to petitioner. Petitioner argues that since he "personally received nothing of measurable value from the corporation's payments to third parties" and "the expenditures benefited the corporation," constructive dividend treatment is precluded. It is well established that any expenditures made by a corporation for the personal benefit of its stockholders, or the making available of corporate-owned facilities to stockholder's for their personal benefit, may result in the receipt by the stockholder of a constructive dividend. Challenge Manufacturing Co. v. Commissioner,37 T.C. 650, 663 (1962). The burden of proof is on petitioner to show that he did not personally benefit from the corporate expenditures. Ashby v. Commissioner,50 T.C. 409, 417 (1968); Challenge Manufacturing Co. v. Commissioner,supra.We will take *440 each expense in turn.
The corporation paid travel expenses consisting of taxi fares, meals, and hotel bills for Joel Uranga, petitioner, in 1974 and 1975, totaling $4,850 and $1,000, respectively. Petitioner gave credible testimony as to the business purpose of 10 of the 16 expenditures. Six of the trips were concededly "unknown" by petitioner; as to the remaining expenses, however, petitioner has met his burden of proving that he did not personally benefit from the expenditures. Accordingly, we hold that $750 of the $4,850 is a taxable distribution in 1974 and $850 of the $1000 is a taxable distribution in 1975 (see tables, infra at 8, 9). We note that the question of includibility of an item of income is determined by rules different from those affecting disallowance of deductions under section 274. Henry Schwartz Corp. v. Commissioner,60 T.C. 728, 744 (1973). Paso purchased a jet airplane for $164,744.34 which was used by company executives and a Cessna 421 for $385,000 which was used by all of the corporation's executives to travel to rural districts in West *441 Texas, areas not serviced by commercial airlines. The corporation paid operating expenses for the two aircraft of $47,861.43 in 1974 and $50,226.60 in 1975. The record demonstrates that there was business use of the two aircraft. But, given the relatively light travel schedule as compared with the enormous expense of the jet, we are not convinced that petitioner did not also receive personal benefit from Paso's payment of these expenses. The record is far from helpful on this point. We are not persuaded that the business use was in excess of the 52 percent determined by the Commissioner. As such, we accept the Commissioner's determination as to the percentage of business use (52 percent) and personal use (48 percent) of the two aircraft. Paso purchased a boat which was used to entertain certain named corporate customers on fishing trips. Petitioner claims that this entertainment was essential to maintaining an adequate and continuous supply of gas for its business at a time when gas was difficult to obtain. Petitioner discussed gas supply contracts with the customers while on the boat. This was the only evidence that the boat was used in furtherance of Paso's business. On the *442 other hand, title to the boat was taken in petitioners' names and petitioners were beneficiaries of the boat's insurance policy. Furthermore, petitioners stated clearly on the sales agreement that the boat would not be used primarily for commercial or business use. In Challenge Manufacturing Co. v. Commissioner,supra at 659, we said that "the mere fact that [petitioner] may have coupled his personal enjoyment and use of that yacht with entertainment of so-called 'business' contacts * * * does not detract from our conclusion that the 'business' use was distinctly secondary." We held in Challenge Manufacturing Co. that this conclusion was sufficient to require the amounts so expended to be includible in petitioner's gross income as dividends. Based upon the facts in the record, our conclusion is the same here. Paso claimed as a deduction on its books and records and Federal corporate income tax return for fiscal year ending September 30, 1975, $500 as "officers' expenses" for contributions made to an El Paso mayoral candidate supported by petitioner. Respondent, *443 on brief, claims that petitioner made use of $500 of corporate funds to support an El Paso mayoral candidate in 1975. This statement is unsupported by the record. Petitioner testified that a vice president of Paso made the contribution without his knowledge and we believe him. Furthermore, respondent argues that "it is of no consequence whether they personally benefited from the contribution * * *." Respondent does not suggest a legal theory behind his argument. The test for determining whether a payment made on the shareholder's behalf is a constructive dividend is whether the shareholder benefited personally from the payment. [3] Accordingly, we hold for petitioners as to this payment. The corporation paid legal expenses of $320 and $640 in 1974 and 1975, respectively, to Paso's corporate counsel. Petitioner could not recall the purpose for which they were paid but could recall that they were not paid for the personal *444 benefit of petitioners. On cross-examination, however, petitioner conceded that it was possible that during 1974, Paso's counsel represented him on at least one personal matter. In light of this conflict, we hold that petitioner has failed to sustain his burden of proving that the legal expenses did not benefit him personally.
In a supplemental memorandum brief, petitioner argues that the Commissioner's statutory notice of deficiency for taxable year 1978 is in direct conflict with his position for taxable years 1974, 1975, and 1976. Petitioner argues in support of this that the 1978 statutory notice does not take an inconsistent position in the alternative as is required and that the Commissioner has abandoned his original determination, forfeiting the presumption of correctness that attaches to the statutory notice, thereby shifting the burden of proof from petitioner to respondent. In respondent's supplemental memorandum brief on this matter, he has clearly stated that the notices are intended to assert alternative deficiencies and that the Commissioner is seeking to tax the transaction in issue only once, not twice. In Doggett v. Commissioner,66 T.C. 101 (1976), *445 we held that the Commissioner did not, as a matter of law, abandon his original determination when he made a subsequent alternative determination in a separate notice of deficiency. Accordingly, we hold for respondent on this issue. Decisions will be entered under Rule 155.
Footnotes
1. For taxable year 1976, the Commissioner determined that the taxable distribution is capital gain as opposed to ordinary income pursuant to Sec. 301, Internal Revenue Code of 1954, as amended. We note, however, that petitioner would be entitled to reduce the basis (if any) of his stock under Sec. 301(c)(2)↩. 2. Statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated. References to "Rules" are to the Tax Court Rules of Practice and Procedure.↩
3. See also, Wekesser v. Commissioner,T.C. Memo. 1976-214; Charlie Sturgill Motor Co. v. Commissioner,T.C. Memo. 1973-281↩.