**TEXAS FARM BUREAU,**
**Plaintiff-Appellee,**

v.

**UNITED STATES of America,**
**Defendant-Appellant.**

**No. 82–1355.**

United States Court of Appeals,
Fifth Circuit.

Feb. 21, 1984.

Rehearing and Rehearing En Banc
Denied May 21, 1984.

Opinion on rehearing, 5th Cir., 732 F.2d 437.

**308**

Glenn L. Archer, Jr., Asst. Atty. Gen., Tax Div., Michael L. Paup, Chief, Appellate, Robert T. Duffy, Sec., Jo-Ann Horn, Dept. of Justice, Washington, D.C., for defendant-appellant.

Peeler Williams, Jr., Waco, Tex., for plaintiff-appellee.

Before CLARK, Chief Judge, GOLDBERG and POLITZ, Circuit Judges.

GOLDBERG, Circuit Judge:

With Congress' dedicated cultivation, the tax code has prospered and thrived, achieving a rate of growth that tillers of non-legislative soil would be hard-pushed to match. Despite the code's phenomenal size and detail, courts must still contend with a particularly persistent and pesterous ambiguity. The problem lies not in separating the seed from the chaff, but in telling debt from equity.

Debt-equity questions commonly involve a corporation and its shareholders—the issue being whether monies advanced by the shareholder to the corporation constitute a loan or a contribution to capital. Because classification of such advances as either debt or equity can produce significant tax consequences, courts frequently have to go beyond the form and into the substance of the particular transaction. As a consequence, courts have developed a set of factors to which they look in resolving debt-equity controversies.

Today we deal with a close cousin of the debt-equity ambiguity. This case poses the same, "loan versus contribution to capital" question present in the shareholder-corporation context. We must decide whether ad-

vances by one non-profit corporation to another separate, yet closely linked non-profit corporation constitute loans or contributions to capital. The government disagrees with the contributing corporation's characterization of the transaction as a loan and the corporation's deduction of the unrepaid advances as a bad debt. Fortunately, the precedent derived from debt-equity cases supplies an effective pesticide to eliminate ambiguity in the instant case. Taking guidance from past judicial solutions to debt-equity puzzles, we conclude that the advances in question constituted contributions to capital and not loans.

I. FACTS

Taxpayer, the Texas Farm Bureau ("TFB") is a non-profit corporation, organized and existing under the laws of the State of Texas. TFB's primary purpose is to provide goods and services, including educational benefits, political lobbying services, life and property insurance, and product marketing services, to people engaged or interested in agriculture. These services are generally provided through several TFB affiliates which TFB has established over the years. TFB generates funds for its operations through individual membership dues and management fees charged to its affiliates. This case involves transactions between TFB and one of its affiliates, Texas Agricultural Marketing Development Association ("TAMDA").

Incorporated in 1961 pursuant to the Cooperative Marketing Act of the State of Texas,[1] TAMDA was created to furnish cooperative marketing services for its members who produce livestock and other agricultural goods. From its inception TAMDA's board of directors has consisted of individuals holding corresponding offices on TFB's board. Membership in TFB constitutes a prerequisite for membership in TAMDA. Formed with no capital stock, TAMDA has relied on membership fees of $5.00 per member and advances from TFB to meet operating and organizational expenses.

---

1. Currently codified at Tex.Agric.Code Ann. § 52.001 et seq. (Vernon 1982).

The advances from TFB were made pursuant to an April 26, 1961, agreement between TFB and TAMDA ("the agreement").[2] The agreement was signed on behalf of each party by J.H. West, president of both organizations. It provided that TFB would supply all management and clerical services for TAMDA. In return, TAMDA agreed to reimburse TFB for expenditures made on TAMDA's behalf and to pay TFB a "reasonable management fee."[3] The following schedule sets out the yearly totals of TFB's advances to TAMDA:

| Fiscal Year Ending October 31 | Amount Advanced by Texas Farm Bureau | Cumulative Total |
| --- | --- | --- |
| 1961 | $ 1,398.10 | $ 1,398.10 |
| 1962 | 1,482.37 | 2,880.47 |
| 1963 | 3,133.97 | 6,014.44 |
| 1964 | 3,399.35 | 9,413.79 |
| 1965 | 6,461.77 | 15,875.56 |
| 1966 | 1,690.41 | 17,565.97 |
| 1967 | 65,128.85 | 82,694.82 |
| 1968 | 0 | 82,694.82 |
| 1969 | 80,000.00 | 162,694.82 |
| 1970 | 4,251.20 | 166,946.02 |

Promissory notes, bearing a 7 percent interest rate but with no fixed maturity dates, evidenced $50,000 of the 1967 advance.[4] The notes are not part of the record, however, as they have been either lost or destroyed. The parties never established any fixed repayment schedule, and TAMDA never paid any interest on the notes.

Other than the $50,000 advance in the 1967 fiscal year, none of the advances made to TAMDA were evidenced by a note, bond, or other obligation. Furthermore, the parties made no provision for payment of interest on any of this "nonevidenced indebtedness." Except for the partial payment of a management fee assessment[5] and a $3,000 payment made October 26, 1966, TAMDA made no payments towards the management fees or in repayment of advances.

TFB advanced TAMDA an additional $84,351.20 during the 1969 and 1970 fiscal years, despite a 1968 write off of $48,933.28 in management fees owed by TAMDA. Then, in its return for fiscal 1970, TFB deducted as an uncollectable bad debt $164,118.13, representing unpaid TAMDA advances made from 1961 through 1970. No

2. The agreement (as read into the record) provided, in pertinent part:

In consideration of the premises [sic] promises and of the mutual covenants herein contained, the parties hereto agree to as follows: Farm Bureau agrees and covenants as follows: (a) To provide any and all managerial and clerical services necessary for the conduct of business of the association; (b) To furnish all facilities necessary for the operation of the association; (c) Such facilities shall include but are not limited to office space, office furniture and equipment, files, filing cabinets, telephone service, local and long distance, stationery, postage and supplies; (d) To use its good offices, influence and prestige in promoting the general welfare of the association and to cooperate with the association in carrying on any informational or educational programs designed and intended to promote the association; (e) Not to incur any indebtedness or create any obligations on behalf of the association, either implied or otherwise, unless specifically authorized by the association in writing; (f) To be covered at all times in the implementation of this management agreement by the provisions, spirit and intent of the articles of that corporation and bylaws of the association. Number 2. The association [TAMDA] agrees and covenants as follows: (a) Subject only to the conditions hereof and on presentation of itemized account of expenditures and expenses incurred by Farm Bureau on behalf of and in the interest of the association, the association shall reimburse Farm Bureau for such expenditures and expenses within 30 days of the close of its fiscal year; (b) Pay a reasonable management fee to Farm Bureau as may be mutually agreed to between the association and the Farm Bureau from time to time.

This agreement shall take effect on date of execution and shall continue in full force and effect from such date until the end of the current fiscal year of the association and from year to year thereafter.

Record, Vol. II, pp. 72–73.

3. TFB did not charge TAMDA management fees during the period from 1961 through 1967. In 1968, TFB charged a management fee of $73,400. Of this amount, TAMDA paid $25,466.72 and TFB wrote off the remaining $48,933.28 as uncollectable. None of that amount is included in the advances in question in this lawsuit.

4. The $65,128.85 advanced during the 1967 fiscal year included $50,000 furnished to establish a custodial account, as required by the United States Packers and Stockyard Act. 7 U.S.C. §§ 181–229.

5. *See supra,* n. 3.

**310**

court action by TFB against TAMDA preceded the write-off. TAMDA never ceased to do business during the 1969–1970 period and was operating at the time of trial.

On audit, the Commissioner of Internal Revenue denied the bad debt deduction. Taking the position that the $164,118.13 in advances constituted contributions to capital that did not become wholly worthless in 1970, he concluded that the advances did not create a bona fide debt. Accordingly, the Commissioner assessed deficiencies. TFB paid the amounts assessed and, following denial of its refund claims, sued for a refund in district court.[6]

## II. PROCEDURE BELOW AND ISSUES ON APPEAL

The case was tried before a jury. At the close of TFB's case the government moved for a directed verdict. The government argued that because the parties' stipulations resolved any conflict regarding "operative facts," the court should determine as a matter of law whether the advances constituted debt or contributions to capital. The court denied the motion. Subsequently, the jury returned a verdict in favor of the taxpayer, finding that the advances were loans, that TFB held a reasonable expectation of repayment when the advances were made, and that 98% of the debts became worthless in fiscal year 1970. The court denied a government motion for judgment notwithstanding the verdict or, in the alternative, for a new trial.

On appeal, the government argues that the trial court erred in submitting to the jury the issue of whether the advances constituted capital contributions or loans. Rather, as a question of law, the issue should have been decided by the court. In addition, the government contends that given the stipulated facts, the court erred in not holding the advances to be capital contributions.

## III. ANALYSIS

As we noted above, the issues in this case closely correspond with those arising in common debt-equity cases—cases involving advances from a shareholder to a corporation. Loan transactions between a corporation and its shareholders require special scrutiny primarily because of the lender/shareholder's dual interest in the corporation. *See Tomlinson v. 1161 Corporation*, 377 F.2d 291, 296 (5th Cir.1967). One manifestation of this dual interest is that, depending on how an advance is structured, the lender's ownership of stock may, in itself, effect a return of capital. Allowing the lender to write off what is essentially an equity interest as a bad debt produces a deduction that corresponds with no real loss.

The advance in the case at bar, however, did not run from shareholder to corporation. Rather, TFB, one non-profit corporation made advances to TAMDA, a separate non-profit corporation. Nevertheless, the circumstances here move us to draw an analogy to profit corporations and their shareholders. In this case, one of the parties seeks tax advantages through the same technique used by shareholders and profit corporations—proclaiming in words but not in deeds that money put into the corporation constitutes debt rather than capital contributions. TFB holds a substantial interest in TAMDA—one comparable to the interest of shareholders in a profit corporation. Specifically, TAMDA was formed to meet the needs of certain of TFB's members. Record, Vol. I, p. 229; Trial Transcript, p. 26. The same individuals sit on both boards of directors. TAMDA's members, the analogs of shareholders in a profit corporation, are a subgroup of TFB's members. To the extent that the TFB advances make up part of TAMDA's financial structure, and to the extent that TAMDA's members benefit financially from TAMDA's success, a portion of TFB's member-

---

6. The suit seeks a refund for the years 1967, 1968 and 1970. Although I.R.C. § 501(c)(5) exempts TFB from the regular corporate income tax, the organization remains subject to tax on unrelated business income under I.R.C.

§ 511. TFB's bad debt deductions eliminated its 1970 unrelated business income liability and generated net operating loss carrybacks to 1967 and 1968.

ship also benefits. Therefore TFB, functioning as an organizational proxy for its members, possesses an interest in TAMDA very similar to an equity or shareholder interest.

█ Given such an interest, the transaction at issue demands the kind of scrutiny regularly given debt-equity controversies. In resolving such controversies courts have looked to the circumstances surrounding the purported loan transaction. Attempts to make this process more rational and consistent have produced a list of specific factors commonly relevant to debt-equity determinations.[7] They are:

(1) the names given to the certificates evidencing the indebtedness;

(2) the presence or absence of a fixed maturity date;

(3) the source of payments;

(4) the right to enforce payment of principal and interest;

(5) participation in management flowing as a result;

(6) the status of the contribution in relation to regular corporate creditors;

(7) the intent of the parties;

(8) "thin" or adequate capitalization;

(9) identity of interest between creditor and stockholder;

(10) source of interest payments;

(11) the ability of the corporation to obtain loans from outside lending institutions;

(12) the extent to which the advance was used to acquire capital assets; and

(13) the failure of the debtor to repay on the due date or to seek a postponement.

*Estate of Mixon v. United States, supra,* 464 F.2d at 402.

Many of these factors are relevant in this case. Rather than being tailored only to contrast debt with equity in profit corporations, most of the factors focus on the definition of debt under the tax code.[8] They transcend the differences between a shareholder's equity interest and TFB's interest in TAMDA. While we exclude consideration of certain factors in this case because of the particulars of the transaction, such would be the procedure in most debt-equity cases. Even with respect to traditional debt-equity cases, consideration of the factors requires not a simple counting process, but an evaluation. *Tyler v. Tomlinson, supra,* 414 F.2d at 848, *Slappey Drive Ind. Park v. United States, supra,* 561 F.2d at 581. Depending on the particular facts of a case, different factors come to the fore. *Slappey,* 561 F.2d at 581; *Curry v. United States, supra,* 396 F.2d at 633–34.

### A. Debt or Capital Contribution—a Question of Law

Courts generally bear responsibility for applying debt-equity factors; characteriza-

**7.** The struggle to exterminate debt-equity ambiguities has a long history. *See, e.g., Slappey Drive Industrial Park v. United States,* 561 F.2d 572 (5th Cir.1977); *Estate of Mixon v. United States,* 464 F.2d 394 (5th Cir.1972). *Dillin v. United States,* 433 F.2d 1097 (5th Cir.1970); *Tyler v. Tomlinson,* 414 F.2d 844 (5th Cir.1969); *Berkowitz v. United States,* 411 F.2d 818 (5th Cir.1969); *Curry v. United States,* 396 F.2d 630 (5th Cir.), *cert. denied,* 393 U.S. 967, 89 S.Ct. 401, 21 L.Ed.2d 375 (1968); *Tomlinson v. 1661 Corp.,* 377 F.2d 291 (5th Cir.1967); *United States v. Snyder Bros. Co.,* 367 F.2d 980 (5th Cir.1966); *Montclair, Inc. v. Commissioner of Internal Revenue,* 318 F.2d 38 (5th Cir.1963); *Rowan v. United States,* 219 F.2d 51 (5th Cir. 1955).

**8.** Judge Brown described the function of the factor analysis in *Tomlinson v. 1661 Corporation, supra:*

In the course of determining whether a particular transaction creates a valid and subsisting "indebtedness" within the statutory meaning, this court has in the past analyzed the pertinent facts of the transaction in connection with certain criteria considered to be controlling. Generally, these criteria are designed to disclose the real nature of the transaction in question—that is whether it exhibits the characteristics of a bona-fide loan to the corporation which is expected, indeed, may be compelled, to be repaid in full at some future date, or whether as a formalized attempt to achieve the desired tax result while lacking in necessary substances, it merely parades under the false colors of such a transaction.

377 F.2d at 295.

**312**

tion of an advance as either debt or contribution to capital presents primarily a question of law.[9] *Estate of Mixon v. United States, supra,* 464 F.2d at 402; see also *Slappey Drive Industrial Park, supra,* 561 F.2d at 582, n. 17; *Tyler v. Tomlinson,* 414 F.2d at 850. We perceive no reason to deviate from this general rule under the facts of the instant case.

■ The only exception to debt-capital contribution determination as a matter of law arises when a court must rely on the parties' subjective intent, factor number seven. Issues of intent pose questions of "pure fact." *Byram v. United States,* 705 F.2d 1418 (5th Cir.1983); see also *Pullman-Standard v. Swint,* 456 U.S. 273, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982). But, reliance on subjective intent and the submission of the debt-capital contribution question to a jury becomes necessary only when a court's analysis of other, objective factors fails to provide clear signals. The *Mixon* court stated that where "the objective facts of the case are ambiguous and do not result in a clear manifestation of objective intent, then subjective intent is relevant on the issue." *Mixon, supra,* 464 F.2d at 407. The court, though, in *Tyler v. Tomlinson, supra,* 414 F.2d 844, pointed out that reliance on subjective intent should indeed be the exception.

> Tax law requires that creditorship have genuine existentiality (citation omitted). This requires more than a declaration of intention to create an indebtedness and more than the existence of corporate paper encrusted with the appropriate nomenclature captions.
>
> If appellants mean to say that a mere showing of an intent to create an indebtedness and the existence of something called "notes" is sufficient to take their case to the jury, we must disagree. If

that were true, every debt-equity case would require a jury verdict no matter how transparent the attempt at tax avoidance. We, therefore, look not to mere labels or to the self-serving declarations of the parties, but to the more reliable criteria of the circumstances surrounding the transaction.

414 F.2d at 850.

TFB argues that the instant case falls within the exception where consideration of subjective intent is necessary. Maintaining that the facts stipulated to in the trial court left substantial ambiguity as to the import of the relevant, objective, debt-equity factors, TFB argues that the issue of intent was properly submitted to the jury. Determination of this first issue, therefore, requires an analysis of the relevant, objective factors surrounding TFB's advances to TAMDA.

### B. Debt or Capital Contribution—the Objective Factors

Turning to that analysis, we note that three factors point weakly towards debt. Factor one, the names given to the certificates evidencing the indebtedness, suggests debt with respect to $50,000 of the advances. "Notes" evidenced that amount of the $166,946.02 total.[10] This indicator has little force, however. After the original notes were either lost or destroyed,[11] the parties never issued new notes to replace them. In addition, of the twelve "objective" *Mixon* factors, factor one has the largest subjective content. The parties' decision to call the certificates "notes" sheds little light on the transaction's real substance. In any case, to the limited extent that factor one indicates debt, we find other factors overriding.

Factor nine, identity of interest between creditor and shareholder, also weighs lightly

---

9. Contra, *see Electronic Modules Corp. v. United States,* 695 F.2d 1367, 1371 (Fed.Cir.1982); *Sayles Finishing Plants, Inc. v. United States,* 399 F.2d 214, 218, 185 Ct.Cl. 196 (1968); *Diamond Bros. Co. v. Commissioner,* 322 F.2d 725, 730 (3rd Cir.1963); *Gilbert v. Commissioner,* 262 F.2d 512, 513 (2d Cir.), *cert. denied,* 359 U.S. 1002, 79 S.Ct. 1139, 3 L.Ed.2d 1030 (1959).

10. TFB advanced $114,198.13 without a note or other indicia of indebtedness.

11. *See supra,* p. 309.

in the instant analysis. It applies specifically to the situation where shareholders have advanced funds to their corporation. The focus is on whether a contributing shareholder owns the same proportion of the company's stock as he does of the purported debt. If "proportionality" exists, how the contributor breaks down the advance between debt and equity will not affect control of the company. *See Slappey Drive Ind. Park v. United States, supra,* 561 F.2d at 583. In such circumstances tax considerations may well be the primary force in the contributor's characterization of the transaction. Strictly speaking, the factor does not apply to the case at bar, one involving an advance between two nonprofit corporations. The underlying notion of identity of interest does have relevance, however. A complete identity of interests would exist between TFB as creditor and TFB as representative of TAMDA's members if the two organizations had identical memberships. Because TAMDA's members comprise only a subgroup of TFB's members, symmetry of interests is incomplete. The factor thus cuts somewhat in favor of a finding of debt. But, even its limited significance fades in the light of the other factors.

Next we observe that the agreement between TFB and TAMDA established a fixed due date for repayment of the advances. Again, however, the circumstances of this case negate this factor's importance. Although the agreement between TAMDA and TFB required repayment of the advances within 30 days of the close of each year, that provision was a dead letter. TFB advanced money to TAMDA year after year, despite TAMDA's failure to comply with the repayment provision. Moreover, the very limited outside financial resources

of TFB,[12] coupled with the complete identity between the two organizations' board of directors, makes illusory the notes' payment on demand provisions. *See Tyler v. Tomlinson, supra,* 414 F.2d at 849.

Turning to the remaining, relevant factors,[13] we find that they unwaveringly indicate that the advances were not debt. TAMDA's dependence on its earnings to repay TFB's advances is one illustration. The only documented nonearnings source for repayment of TFB lay in dues paid by TAMDA members. But, given a yearly dues income of only $3,000,[14] TAMDA would have to look elsewhere to repay TFB —i.e., to the commissions it charged for marketing services. Record Vol. I, p. 104. The dependence on membership dues also raises the factor of inadequate capitalization. With such limited resources, TAMDA could hardly have been more thinly capitalized.

TFB's "right to enforce payment of principal and interest" was only a mirage. The agreement signed at TAMDA's inception gave TFB a contractual right to repayment. In actuality, however, repayment fell within TAMDA/TFB management discretion. The complete overlap in the boards of TFB and its affiliate precluded any arms-length relationship—any realistic expectation that a demand for payment would be made or legal enforcement actions would be taken. TFB stipulated in the trial court that it never took "formal collection actions" against TAMDA despite TAMDA's repeated failures to meet the annual due dates. Record, Vol. I, p. 104. In addition, the advances were *de facto* subordinated to TAMDA's corporate debt. TAMDA failed to meet its obligations to TFB while still

12. *See infra,* p. 313.

13. Two of the *Mixon* factors have no bearing on the instant case. Factor five, whether the source of the advances took an increased management role in the recipient, cuts neither way because of the complete identity among management personnel in TAMDA and TFB. No increase in management role was possible for TFB. Ability to obtain loans from outside lending institutions, factor eleven, provides no help either. Unless TFB or its individual members guaranteed the debt, TAMDA never attempted to secure credit from outside sources.

14. TAMDA had 600 members during the relevant period, each member paying $5 in annual dues.

**314**

meeting all of its obligations to other creditors.

TAMDA's *use* of the advances also leads us to conclude that they were not debt. TAMDA spent the advances on basic operating costs such as rent, supplies, travel, etc. While the advances were not used to obtain capital assets, the organization wholly depended on the advances to begin functioning. Purchase of such "necessary first assets" points us away from a finding of debt. *Slappey Drive Industrial Park, supra,* 561 F.2d at 583.

A particularly important indicator in distinguishing debt from capital contributions focuses on interest payments. As this court stated in *Curry v. United States, supra,* 396 F.2d 634, "a true lender is concerned with interest." In this case, the agreement under which TFB advanced $114,118.13 did not call for payment of interest. Even with respect to the interest-bearing $50,000 notes, TAMDA never made a single interest payment. Failure to insist on interest payments clearly demonstrates that TFB was not concerned with interest income. Rather like an equity holder, TFB cared more about the continued operation and growth of TAMDA. *See id.; Estate of Mixon v. United States, supra,* 464 F.2d at 409.

## IV. CONCLUSION

■ *Slappey Drive, supra,* articulated the essential difference separating lenders and holders of an equity interest: "shareholders place their money 'at the risk of the business' while lenders seek a more reliable return." 561 F.2d at 581, *see also Midland Distributors, Inc. v. United States,* 481 F.2d 730, 733 (5th Cir.1973); *Dillin v. United States, supra,* 433 F.2d at 1103. Self-serving assertions that payment was expected cannot be substituted for some concrete demonstration of the actual existence of such expectations. We have analyzed the laundry list of objective factors relevant to whether the relationship at issue was one of a debtor and creditor. We can find no

maimed creditor. The absence of fixed, realistic dates for repayment, the failure to provide for meaningful enforcement mechanisms, the dependence of TAMDA upon its earnings to repay the advances, the *de facto* subordination of the TFB debt to other debt, the use of the advances for initial operating expenses, and the lack of emphasis on interest cut strongly against the notion that the advances were debt. Analysis of these factors shows us the true and unambiguous nature of TFB's advances to its affiliate. TFB hoped to profit by its relationship with TAMDA and furnished the capital to keep it going. No other scenario can be reeled out. The district court erred in not finding that the advances were, as a matter of law, contributions to capital.

The problem of distinguishing debt from capital contributions has been with us and will likely remain with us for a long time. Primary reliance upon subjective indications of intent is simply not an effective way of resolving that problem. In a land of hard economic facts, we cannot root important decisions in parties' pious declarations of intent. Awarding the government its rightful harvest, we hold that TFB's advances to TAMDA were not loans and therefore were not deductible as bad debts. The ruling of the district court is,

REVERSED.