**PIGGY BANK STATIONS, INC.,**
Petitioner-Appellant,

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.**

No. 84–4042.

United States Court of Appeals,
Fifth Circuit.

March 21, 1985.

Towner Leeper, El Paso, Tex., for petitioner-appellant.

Glenn L. Archer, Jr., Asst. Atty. Gen., Carleton D. Powell, Michael L. Paup, Chief, Appellate Sec., John P. Griffin, Tax Div., Dept. of Justice, Joel Gerber, Acting Chief Counsel, John H. Menzel, Director, Tax Lit. Div., Dept. of Justice, Washington, D.C., for respondent-appellee.

Before GEE, WILLIAMS and JOLLY, Circuit Judges.

GEE, Circuit Judge:

Piggy Bank Stations, Inc. (Stations) and Piggy Bank, Inc. brought an action in the United States Tax Court contesting the assertion of income tax deficiencies against them by the Commissioner of Internal Revenue (the "Commissioner"). The tax court held for the Commissioner. We affirm.

## I.

Sam S. Klink and William Johnstone owned equal shares of two affiliated corporations, Piggy Bank Land, Inc. (Land) and Stations. Stations operated gasoline stations and owned some of the stations it operated. Land owned and leased other filling stations to Stations, and still other filling stations were leased to Stations by unrelated parties. Klink handled the financial matters of the Piggy Bank corporations, while Johnstone concentrated on managing Stations' business.

Klink was also one of two equal partners in the Browne & Klink partnership (B & K), which was engaged in various land development projects. These projects included locating stations sites and designing and constructing filling stations to be operated by Stations and in most cases to be owned by Land. Robert F. Brown managed the activities of B & K, and Klink handled its financial affairs.

General Computer Service, Inc. (Computer) was formed to market computer programs that originally had been developed to facilitate internal reporting and accounting control of Stations' business. Stations, Klink, and Johnstone, among others, became stockholders in Computer.

In March 1976, Klink purchased Johnstone's interests in Stations and Land for cash. Then Klink sold all of the Stations and Land stock to a newly formed corporation, Piggy Bank, Inc. The new owner of Stations and Land claimed various deductions for bad debts. The Commissioner disallowed these deductions and assessed deficiencies against Stations and Land. Stations and Land challenged the Commissioner's ruling in the tax court. The tax court upheld the Commissioner's ruling, and this appeal followed.

## II.

Before analyzing the particular purported bad debts, we note certain principles that control this case. Internal Revenue Code (IRC) § 166(a) provides: "[t]here shall be allowed as a deduction any debt which becomes worthless within the taxable year." To be deductible under § 166(a), the debt must be bona fide:

> *Bona fide debt required.* Only a bona fide debt qualifies for purposes of section 166. A bona fide debt is a debt which arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money.... A gift or contribution to capital shall not be considered a debt for purposes of section 166. The fact that a bad debt is not due at the time of deduction shall not of itself prevent its allowance under section 166.

Treas.Reg. § 1.166–1(c). The question whether payments or disbursements by a taxpayer are to be treated as debts for tax purposes is an issue of fact, and we will not disturb the Commissioner's finding on such issues unless the finding is clearly erroneous. *Estate of Mann v. United States,* 731 F.2d 267, 273 n. 8 (5th Cir.1984). *See also Brimberry v. Commissioner,* 588 F.2d 975, 977 (5th Cir.1979); IRC § 7482(a).[1] The taxpayer has the burden of establishing the

---

1. Section 7482(a) provides:

    Jurisdiction. The United States Courts of Appeals (other than the United States Courts of Appeals for the Federal Circuit) shall have exclusive jurisdiction to review the decisions of the Tax Court, except as provided in section 1254 of Title 28 of the United States Code, in the same manner and to the same extent as decisions of the district courts in civil actions tried without a jury; and the judgment of any such court shall be final, except that it shall be subject to review by the Supreme Court of the United States upon certiorari, in the manner provided in section 1254 of Title 28 of the United States Code.

bad debt characterization. *Mann*, 731 F.2d at 273 n. 8; *Byram v. Commissioner*, 555 F.2d 1234, 1236 (5th Cir.1977).

In this case, Stations and Land claimed bad debt deductions for three different types of disbursements that the corporations made. Although each type of disbursement requires a slightly different analysis, we agree with the tax court's conclusion that none of the disbursements was made with the intent to create an indebtedness of the payee to Stations or Land.

■ *A.* The first category of bad debt loss claimed as a deduction consists of distributions Stations made to Klink in March 1976 in connection with Klink's sale of his share of Stations. The existence of a debt presupposes the existence of a loan. *Alterman Foods, Inc. v. United States*, 505 F.2d 873, 875–77 (5th Cir.1974), sets forth the factors to be considered in determining whether a disbursement to a shareholder is properly characterized as a loan. These factors include: (1) whether the parties intended to create an unconditional obligation to repay, (2) whether the shareholder controlled the corporation, (3) whether any security was given, (4) whether there was a maturity date and a specific repayment schedule, and (5) whether the shareholder had the ability to repay.

■ As consideration for Klink's share of Stations, Klink received his share of the proceeds of Stations' profit-sharing plan and the cash value of a life insurance policy Stations had held on him. Stations claimed and deducted both sums as bad debts. As the tax court correctly recognized, however, no statutory or other authority exists for these deductions. Neither the life insurance policy nor the profit-sharing plan has even one of the characteristics of a bona fide debt. Transferring the cash value of an insurance policy is a common occurrence when the ownership of a closely held corporation changes hands, and the transfer here occurred pursuant to an express provision of the contract of sale between Klink and the purchaser. The transfer certainly created no indebtedness. As

for the profit sharing plan, IRC § 411(d)(3) required Stations to distribute the plan assets to the participants upon the termination of the plan (assuming the plan was "qualified" under IRC § 401). No indication exists that Stations had any claim to the assets in the profit-sharing plan, either before or after the sale of Stations' stock. Therefore, no indebtedness could have resulted from the distribution of Klink's share of the plan assets.

■ The final component of the first type of bad debt loss involves the assumption of a debt of Johnstone. When Klink was negotiating the sale of Stations, the prospective purchasers noted an alleged debt of Johnstone to Stations. Klink assumed half the debt ($4588.11) to avoid upsetting the sale. Klink's proceeds from the sale were reduced by some $7000 for payment of "personal bills." Because the prospective purchasers knew Klink to be insolvent at this time, the tax court found that the $7000 had included the assumed debt of $4588.11. The court concluded that the assumed debt had been paid, and on that basis held that the Commissioner had properly disallowed the deduction of the $4588.11 as a bad debt. Stations produced no evidence to rebut the Commissioner's determination, and thus failed to bear its burden of proof on this issue. *See Brimberry v. Commissioner*, 588 F.2d 975, 977 (5th Cir.1979). We therefore affirm the tax court's ruling.

■ *B.* The second type of bad debt loss claimed by Stations and Land involves advances these corporations made to B & K. When Stations or Land sought new sites for filling stations or built new filling stations on these sites, the corporations hired B & K to find the sites and then to act as general contractor during construction. Both Stations and Land advanced money to B & K in connection with these activities, and both contend that the advances became deductible bad debts when B & K became insolvent. The Commissioner and the tax court rejected this contention, ruling that the advances were normal

progress payments for construction work rather than loans and disallowing the bad debt deduction.

The conclusion of the Commissioner and the tax court on this issue is clearly correct. Aside from the fact that Stations and Land apparently carried the advances on their books as accounts receivable, nothing in the record indicates that the parties intended the advances to create an indebtedness of B & K to Stations or Land. B & K made no repayment of any sums advanced to it from the time of the first advances in 1966 until the sale of Stations and Land in 1976, and the corporations presented no evidence that B & K was insolvent during much of this period. Stations and Land also failed to present evidence of any agreement they may have had with B & K as to an interest rate, repayment dates, or even whether B & K was obligated to repay the advances.

Stations and Land argue that the tax court's recognition that some portion of the total amount advanced to B & K may have been for B & K projects not directly involving locating and developing properties for them, combined with the parties' stipulation that the advances occurred in the course of the corporations' business, requires us to reverse the Commissioner's ruling that Stations and Land were not entitled to deduct their advances as bad debts. Stations and Land argue that reversal is required because no statute, regulation, or case requires them to establish a precise allocation of the amount advanced for developing service stations and the amount advanced for other projects. This contention is meritless. Because Stations and Land are required to establish every element of any claimed deduction, the corporations have the burden of establishing the exact amount of any advances not used to develop service stations pursuant to a debtor-creditor relationship. *Watson v. Commissioner*, 613 F.2d 594, 599 n. 7 (5th Cir.1980). Stations and Land have failed to meet this burden because they have failed to establish that any debt existed between them and B & K. That the advances occurred in the ordinary course of the corporations' business is irrelevant. We hold that the tax court properly upheld the Commissioner's disallowance of the corporation's deduction for the advances to B & K.

*C.* The final type of bad debt loss claimed as a deduction involves disbursements Stations made to Computer, a corporation formed to market computer programs that Stations had developed. Stations, Klink, and Johnstone, among others, were shareholders in Computer. For several years, substantially all of Computer's operating expenses were paid by Stations. Stations paid some of the advances to third parties for expenses incurred on Computer's behalf and some directly to Computer. Some of the advances were reflected by promissory notes payable on demand and some were simply carried by Stations as receivables. No payments of interest or principal were made on any of these notes or advances, and Stations claimed a bad debt deduction for the total amount of advances it had made to Computer.

The Commissioner disallowed this deduction, finding that the advances were capital contributions rather than loans, and the tax court affirmed the Commissioner's finding. We hold that the decision of the Commissioner and the tax court on this issue was correct. In *Texas Farm Bureau v. United States*, 725 F.2d 307 (5th Cir. 1984), we listed the factors to be considered in determining whether an advance is a loan or contribution to capital. These factors are: (1) the names given to the instruments evidencing the indebtedness; (2) the presence or absence of a fixed maturity date; (3) the source of the payments; (4) the right to enforce payment of principal and interest; (5) the resulting participation in management; (6) the status of the contribution in relation to regular corporate creditors; (7) the intent of the parties; (8) "thin" or adequate capitalization; (9) identity of interest between creditor and stockholder; (10) source of interest payments; (11) the ability of the corporation to obtain loans from third-party lenders; (12) the extent to which the advance was used to

acquire capital assets; and (13) the failure of the debtor to repay on the due date or to seek a postponement. *Id.* at 311; *see also Estate of Mixon v. United States,* 464 F.2d 394, 402 (5th Cir.1972).

Applying the *Texas Farm Bureau* factors to the facts of this case, we conclude that the Commissioner properly characterized Stations' disbursements to Computer as capital contributions rather than loans. Computer was severely undercapitalized from its beginning. There was no fixed maturity date for repayment of any of the advances. Furthermore, Computer made no repayment of principal or interest, and because the advances were used to meet Computer's day-to-day operating expenses, Stations could have expected repayment only if Computer became a successful business enterprise. The record indicates that beginning in 1973 or 1974, Computer was unable to obtain additional financing from third parties.[2] Finally, although some of the advances were evidenced by demand notes, these notes were not issued contemporaneously with the individual advances but rather at irregular intervals to memorialize the aggregate total advanced at various times. And although the notes set an interest rate of ten percent, no interest was collected. The existence of the notes under these circumstances does little to establish that the advances were loans rather than capital contributions. *See Texas Farm Bureau,* 725 F.2d at 312. In view of this evidence, the tax court's characterization of Stations' advances to Computer as capital contributions was correct.

For the foregoing reasons, the judgment of the tax court is

AFFIRMED.

---

**2.** Stations argues that the tax court erroneously found that Computer was unable to obtain third-party financing. In particular, Stations contends that the tax court ignored Computer's "Software License Agreement" with Greyhound Computer Corporation (Greyhound), dated January 3, 1975, in which the parties acknowledged that Greyhound had extended the maturity date on Computer's $300,000 debt and had agreed to loan Computer an additional $1,500,000. This provision of the agreement, Stations contends, proves that Computer could obtain third-party financing and constitutes persuasive evidence that Stations' advances to Computer were loans. We disagree.

First, the loan package between Greyhound and Computer mentioned in the Software License Agreement appears to be simply a minor component of the license agreement, under which Computer agreed to transfer substantially all its assets to Greyhound in exchange for royalty payments. (Greyhound later exercised its option to terminate this contract.) Second, even if the loan from Greyhound had been independent of other transactions, it cannot be considered persuasive evidence that Computer was able readily to obtain third-party financing at this time, for Computer's financial records indicate that it was insolvent and had been for some time. Finally, even if we accepted Stations' contention regarding the loan at face value, this evidence would be insufficient, in view of the overwhelming evidence suggesting that Stations' advances to Computer were capital contributions, to sustain Stations' burden of proof to show that the advances were loans.