**In the Matter of OTIS & EDWARDS, P.C., f/k/a Otis, Peters, Becker & Pietsch, P.C., f/k/a Peter R. Barbara & Associates, P.C., f/k/a Barbara, Ruby, Domol, Bowerman, Miller and Aaron, P.C., Debtors.**

**Bankruptcy No. 82–03508–G.**

United States Bankruptcy Court, E.D. Michigan, S.D.

Nov. 18, 1985.

Robert B. Webster, Hill, Lewis, Goodrich, Adams & Tait, Birmingham, Mich., Trustee.

Robert A.W. Strong, Hill, Lewis, Goodrich, Adams & Tait, Detroit, Mich., for trustee.

David S. Grossman, Washington, D.C., for U.S. Department of Justice.

## MEMORANDUM AND ORDER DENYING TRUSTEE'S MOTION FOR A DETERMINATION OF FEDERAL TAX LIABILITY

RAY REYNOLDS GRAVES, Bankruptcy Judge.

The Court is presented with a motion filed by Robert B. Webster, Trustee, pursu-

ant to 11 U.S.C. § 505 for a determination of the federal tax liability of Otis & Edwards, P.C. (Debtor). Having reviewed and considered the exhibits and testimony produced from the August 14th and 15th hearings on the trustee's motion, the Court finds the motion must be DENIED.

The law firm of Otis & Edwards originated in 1970 as Barbara & Wisok, P.C. At that time, Peter R. Barbara (Barbara) was the majority shareholder owning 750 of the corporation's 1,000 shares, and the corporation's president and secretary treasurer. Norton Wisok owned the balance of 250 shares. Through the years the corporation's name changed several times[1] with Barbara remaining president of the corporation. In 1977 Barbara also became the sole shareholder and changed the name of the corporation to Peter R. Barbara & Associates, P.C. (Barbara & Associates).

Beginning in fiscal year 1970–1971,[2] numerous transactions between Barbara and the corporation were recorded on the corporation's ledger balance as "Loan Receivable Account-Peter R. Barbara." The proceeds of the "loans" were disbursed by a check from the corporation payable to Barbara. Except for fiscal year 1973–1974, the outstanding loan balance increased every year from fiscal year 1970 to 1981. The balance rose from $16,396.69 in 1970–1971 to $83,870.48 in fiscal year 1971–1972 and $92,462.83 in fiscal year 1972–1973. The balance decreased in fiscal year 1973–1974 to $66,846.33 and jumped dramatically to $295,658.91 in fiscal year 1974–1975, $552,232.75 in fiscal year 1975–1976. The upward spiral continued through the following years. The loan balance reached $705,869.26 in fiscal year 1976–1977, $991,-022.89 in fiscal year 1977–1978, $1,168,-433.17 in fiscal year 1978–1979 and $1,324,-416.41 in 1979–1980. The upward spiral came to a halt in fiscal year 1980–1981 at $1,641,868.01 (Exhibit F). At the end of fiscal year 1980–1981 Barbara & Associates filed a corporate tax return indicating a tax liability of $684,017.00. The amount was never paid.

In a deposition taken on September 13, 1984[3] (Exhibit I) Barbara responded to questions directed to him by Robert S. Strong, attorney for the Trustee, regarding the transactions. Barbara stated the withdrawals were loans authorized by the the Board of Directors at duly convened meetings of the Board. Although he was the sole shareholder in 1979 and could not recall the names of the Board members, the dates the Board convened, or whether in 1978 a plan to repay the withdrawals existed, Barbara stated that the Board's approval of the withdrawals could be found in the minutes of the meetings. He testified that the withdrawals were evidenced by promissory notes issued periodically in favor of the corporation. He further testified that a blanket promissory note encompassing all previous and future withdrawals was executed in favor of the corporation.

Minutes of the Board's meeting authorizing the withdrawals were not produced in either the deposition or in the hearings before this Court. One promissory note, (Exhibit C), executed on April 1, 1972, two months after the close of the fiscal year, was produced. The Trustee maintains the note properly documents all withdrawals from the corporation to Barbara between 1970 and 1981. The note signed by Barbara in favor of Barbara & Wisok, P.C. promises to pay $104,962.83 plus interest at the rate of six percent (6%) per annum, beginning April 21, 1972. Barbara was to make weekly payments of $500.00; a portion of each payment was to be applied to the interest calculated on the outstanding balance as of the beginning of each month. Although the note did not provide for a

1. Between 1970 and 1982 the corporation changed from Barbara & Wisok, P.C. to Barbara, Ruby, Domol, Bowerman, Miller & Aaron, P.C.; to Peter R. Barbara & Associates, P.C. in 1977; to Otis, Peters, Becker & Pietsch, P.C. and eventually to Otis & Edwards on March 22, 1982.

2. The corporation's fiscal years ran from 2/1 through 1/31 of each year.

3. The deposition was taken as part of *Webster v. Barbara*, Adversary Proceeding No. 83–1310.

maturity date, it did contain language that the note "may be extended from time to time without affecting the liability of the maker."[4]

Through the years the corporation expanded. The corporation's practice grew to include bankruptcy, divorce, real estate, workers' compensation, employment discrimination, automobile negligence, product liability, medical malpractice, and personal injury law. In 1977 Barbara's annual salary exceeded $165,000.00. By 1980 his income surpassed $200,000.00 a year and he had acquired a substantial net worth. From 1970–1980 $1.1 million had been recorded as payments from Barbara to the corporation on the loan receivables. By 1978, however, Barbara's payments were made only by withdrawals from the corporation.

Troubles had begun to emerge. According to Barbara the corporation experienced cash flow problems in 1979. To address the problem the corporation began to transfer client trust funds to the general fund account to pay operating costs and expenses. About the same time the Attorney Grievance Commission for the State of Michigan began to investigate more than 85 complaints from clients of Barbara & Associates. Barbara was later charged by the Grievance Administrator with fifteen counts of failing to properly deliver to clients their share of settlement or judgment proceeds. The conduct was alleged to violate GCR 1963, 953(4),[5] DR 1–102(A)(1) [6] and DR 9–102(B)(4).[7] In an agreement dated October 4, 1980 and a clarifying letter dated September 26, 1980,

Barbara admitted the charges in exchange for a stipulation by the Grievance Administrator to a suspension of three years and one day, beginning February 15, 1981.

On February 5, 1981 Barbara entered into a stock purchase agreement with Sheldon Otis[8] and Barbara & Associates. The agreement provided for Barbara to transfer one share of stock in the corporation to Otis in exchange for a promissory note executed by Otis in the amount of $5,000.00. The note executed by Otis was payable in bi-weekly installments over a ten year period at six percent (6%) interest.

The stock purchase agreement also provided that Barbara's remaining 749 shares of stock were to be redeemed by the corporation for $3,365,000. Barbara, acting as president of Barbara & Associates, executed a promissory note in favor of Barbara individually in the amount of $3,365,-000. The agreement provided for $1,695,-000 of the principal to be paid over a ten year period in equal bi-weekly installments with interest accruing at six percent (6%). The note also provided that a lump sum payment of $1,670,000 was to be due and payable on February 1, 1991.

The agreement acknowledged that Barbara owed the corporation the amount of $1,639,368.[9] Under the terms of the note, interest was to be computed at a rate of 12.25% and payable annually with the principal due and payable on February 1, 1991. The note provided further:

> [A]nd on said date [February 1, 1991] said principal amount shall be credited by the amount of the lump sum payment due on such date in accordance with a

---

4. It is unclear whether the language pertains to an extension of a maturity date or whether this is language used by the Trustee, infra, that the note allows future withdrawals from the corporation to Barbara.

5. GCR 953(4): conduct that violates the standards or rules of professional responsibility adopted by the Court;

6. DR 1–102(A)(1): A lawyer shall not (1) Violate a Disciplinary Rule.

7. DR 9–102(B)(4): A lawyer shall (4) Promptly pay or deliver to the client as requested by a client the funds, securities, or other properties

in the possession of the lawyer which the client is entitled to receive.

8. Sheldon Otis represented Barbara before the Attorney Grievance Commission and is the named partner in the Debtor corporation.

9. The amount is $2,500 more than the loan receivable balance shown on Exhibit F. When asked about the stock purchase agreement Barbara, in the deposition, could not explain the difference in the figures. (Deposition TR. at 37).

promissory note dated even date herewith as described in paragraph 3 of a stock purchase agreement dated February 5, 1981 between the undersigned Peter R. Barbara & Associates, P.C. and Sheldon Otis.

Four months later on May 18, 1981, a federal grand jury investigating Barbara & Associates issued a criminal information against Barbara. The information charged Barbara had unlawfully devised a scheme to obtain money from October 1974 through August 1980. Significantly, the information charged Barbara had converted client trust funds as early as 1974, five years before the corporation, according to Barbara, began to experience cash flow problems.

Additionally, the information charged that Barbara transferred approximately $3,000,000 from the client trust accounts to the general accounts and that the monies were improperly used for the operation of the corporation, even though $1.5 million had been returned. Count I of the information also charged Barbara had violated 18 U.S.C. § 1341 (mail fraud). Counts II and III charged Barbara with violation of 18 U.S. Code § 2314 (interstate transportation of a forged security). On July 23, 1981 Barbara pleaded guilty to all counts and was sentenced to two concurrent prison terms of two and a half years on each count and fined a total of $16,000. He was later incarcerated in a federal penitentiary from September 1981 through June 1983. As a result, Barbara, who was also a member of the State Bar of New York, was suspended by the New York State Bar on April 26, 1982 and subsequently disbarred.

On March 22, 1982, the corporation changed its name to Otis & Edwards, P.C. Three months later, on June 16, 1982 the corporation filed a Chapter 11 petition in bankruptcy. On August 3, 1983, in an effort to prepare a viable plan of reorganization, the Trustee filed an amended corporate tax return for fiscal year ending January 31, 1981. The amended return sought a determination from the Internal Revenue Service (IRS) that outstanding loan balances of $1,776,583 were uncollectible bad debts pursuant to 26 U.S.C. § 166. Included in the amount was the $1,641,868 in loans to Barbara and $134,670 in loans to persons unrelated to the members of the law firm. A determination that the loans were uncollectible bad debts would result in a $5,000 refund to the Debtor. The trustee argued that of the $1,776,583 in loans, $1,641,868 was uncollectible due to Barbara's incarceration and suspension of his license to practice in the States of Michigan and New York.

On July 3, 1984, the IRS issued a thirty-day letter notifying Otis & Edwards of a deficiency. The IRS allowed the bad debt deduction for loans to unrelated persons but disallowed the deduction for the loans to Barbara. The adjustment in tax liability decreased the $686,017 tax liability by $57,384 and the penalty by $2,867. In a detailed summary and analysis, the IRS found the withdrawals from the corporation to Barbara to be dividends. (Exhibit A). Having closely examined the intent of the parties at the time of the transactions and other factors outlined in *Baird v. Commissioner*, 82,220 P–H Memo TC Volume 51 (1982), the IRS determined the withdrawals to be dividends lacking sufficient indicia of loans to constitute a bona fide debt under 26 U.S.C. § 166. The Debtor timely filed a protest to the 30 day letter but review was denied by the IRS.

The Trustee has filed the present motion pursuant to 11 U.S.C. § 505 seeking a bad debt deduction in the amount of $1,651,858. The Trustee relies on *Johnson v. Commissioner* [CCH Dec. 35, 807 (M)] 38 TC Memo 17, 20 (1979), *Aff'd.* 652 F.2d 615 (6th Cir.1981), and argues the withdrawals from the corporation were bona fide loans which became worthless in 1980. The Trustee also asserts that the statute of limitations for classifying a large portion of the Debtor's transactions as dividends has expired and that the I.R.S. is estopped from classifying the transactions as dividends.

The government has filed objections to the motion arguing the amounts withdrawn by Barbara from the corporation are divi-

dends. Alternatively, the government argues that if the amounts withdrawn are deemed to be bona fide loans, the debt did not become worthless in fiscal year 1980.

▬ As a threshold matter, 11 U.S.C. § 505 empowers the Bankruptcy Court to determine the tax liability of a debtor provided the merits of the tax claim has not been previously adjudicated in a contested proceeding before a court of competent jurisdiction. A matter is deemed contested if the debtor has filed a petition in the United States Tax Court prior to the commencement of proceedings in the Bankruptcy Court and the I.R.S. has filed an answer to the petition. 11 U.S.C. § 505, 124 Cong. Rec. H 11, 110–111 (Sept. 28, 1978); S 17, 426–28 (Oct. 6, 1978). Although the parties have stipulated, and we find, that these proceedings are properly before the Court, their view of the role of the Bankruptcy Court under § 505 is misplaced. The Bankruptcy Court is not an appellate court and does not exercise de novo or clearly erroneous review of a determination of the I.R.S. In the motion before the Court, the Trustee begins anew his pursuit of a bad debt deduction under 26 I.R.C. § 166(a).

Section 166(a) allows a deduction for any debt that becomes worthless within a taxable year. For purposes of determining whether a bad debt deduction exists the existence of a debt presupposes the existence of a loan. *Piggy Bank Stations, Inc. v. C.I.R.*, 755 F.2d 450, 453 (5th Cir., 1985), cert. denied —— U.S. ——, 106 S.Ct 130, 88 L.Ed.2d 107 (1985). The character of the debt depends on the intent of the parties at the time the transfer was made. If the intent was primarily to benefit the shareholder, the transfer is deemed to be a dividend. *Johnson*, 38 TCM at 20. Only a bona fide debt qualifies for purposes of § 166. Bona fide debts arise from debtor-creditor relationships upon a valid and enforceable obligation to pay a fixed or determinable sum of money. Tres.Reg. § 166–1(c).

In seeking the deduction the taxpayer has the burden of establishing by a preponderance of the evidence that the withdrawals from the corporation were bona fide debts which became worthless within a specific tax year. *K & R Service Co., Inc. v. United States*, 568 F.Supp 38 (D.Mass. 1983); *Piggy Bank Stations, supra.*

Several objective factors are used to determine the subjective intent of the parties to create a bona fide debt.[10] Despite the many variations, two conclusions can be

**10.** For purposes of 26 U.S.C. § 166 the Courts have used a variety of tests with numerous factors to determine if advances constitute bona fide debts. Additional factors are used to distinguish loans from shareholders to the corporation from contributions to capital. In *Stinnett's Pontiac Service, Inc. v. C.I.R.*, 730 F.2d 634 (5th Cir.1984) thirteen factors were considered: (1) the names given to the certificates evidencing the indebtedness; (2) the presence or absence of a fixed maturity date; (3) the source of payments; (4) the right to enforce payment of principal and interest; (5) participation in management flowing as a result; (6) the status of the contribution in relation to regular corporate creditors; (7) the intent of the parties; (8) "thin" or adequate capitalization; (9) identity of interest between creditor and stockholder; (10) source of interest payments; (11) the ability of the corporation to obtain loans from outside lending institutions; (12) the extent to which the advance was used to acquire. capital assets; and (13) the failure of the debtor to repay on the due date or to seek a postponement.
See also, *Estate of Mixon v. United States*, 464 F.2d 394 (5th Cir., 1972), *Accord, Matter of Une-*

co, Inc., 532 F.2d 1204 (8th Cir., 1976); *In re: Lane*, 742 F.2d 1311 (11th Cir., 1984).
*Piggy Bank Stations, Inc. v. C.I.R.*, 755 F.2d 450 (5th Cir., 1985) narrowed the factors to five: (1) whether the parties intended to create an unconditional obligation to repay, (2) whether the shareholder controlled the corporation, (3) whether any security was given, (4) whether there was a maturity date and a specific repayment schedule, and (5) whether the shareholder had the ability to repay. 755 F.2d at 453.
In *Joel Uranga v. Commissioner*, 46 T.C.M. 567 [CCH] (1983), the court applied a ten point test: the extent of stockholder control, the dividend history of the corporation, the magnitude of the advances, the presence or absence of conventional indicia of debt, the treatment of advances in the corporate financial statements, authorization by the corporation, the pledging of collateral as security, the payment of interest, and the ultimate repayment of the amounts withdrawn. 46 T.C.M. at 572.

drawn regarding the weight to be given each factor individually and collectively. No one single factor is determinative of the taxpayers subjective intent, *Joel Urangra v. Commissioner*, 46 TCM Memo 567, 572 1983–373 Dec. 40, 234 (M), and the factors can be grouped into three categories: (1) the intent of the parties, (2) the form of the instruments and (3) the objective economic reality of the taxpayer.[11] *K & R Service Co., Inc.*, 568 F.Supp at 41. Balancing the three categories characterizes the nature of the transaction.

The Trustee maintains that the test outlined in *Johnson, supra,* demonstrates the transactions between Barbara and the corporation were bona fide debts. The *Johnson* test requires consideration of the following factors: (1) whether the corporation is closely held and controlled; (2) the corporation's history with respect to dividends; (3) the availability of earnings and profits from which the corporation could pay dividends; (4) whether the transfer was documented by notes or an assignment of security; (5) the payment or accrual of interest; (6) whether transfers were made in proportion to stock holdings; (7) how the transferred funds were used; (8) how the transfer is treated on the books and records of the corporation and the shareholder; (9) whether the shareholder had a plan and means for repayment; and (10) the history of repayment. *Johnson,* 38 TC Memo at 20.

Throughout the period in which the withdrawals took place, Barbara was the corporation's majority or sole shareholder and president. When a taxpayer seeks a bad debt deduction and the transaction at issue involves advances from a closely held corporation to "one who is in substantial control of the corporation, such control invites special scrutiny of the transactions." *Uranga,* 46 TC Memo at 567; *Caligiuri v. C.I.R.,* 549 F.2d 1155 (8th Cir.1977); *Matter*

*of Uneco, Inc.,* 532 F.2d 1204 (8th Cir. 1976); *Transamerica Insurance Co. v. Womack, Inc.,* 31 A.F.T.R.2d, 73–471 (E.D. Va.1972), *affirmed,* 33 AFTR2d 74–999 (4th Cir.1974); *Dumire v. Commissioner,* 42 T.C. Memo 438 (1981). Scrutinizing the transactions before the Court finds the Trustee's position inconsistent and unsupported in either direction.

Barbara's inability to recall any of the Board's activity coupled with the Trustee's failure to produce corporate records militates against a finding that the withdrawals were properly documented. The absence of documents is significant when examined alongside the testimony of Herbert Goldstein.

Goldstein was a certified public accountant who had been associated with Barbara since 1967 and whose association continued through 1982. Goldstein's accounting firm was retained by the corporation to set up accounting procedures, prepare monthly profit and loss statements, and year end tax returns. He testified that he recalled seeing a resolution in the corporation's minute book authorizing Barbara to withdraw loans from the corporation. Despite his representations, no attempt was made to support Goldstein's testimony and establish the Board's authorization. There has been no demonstration on the record of the impracticality of obtaining the corporation's documents. Declarations of intentions to treat certain transactions as a loan are an insufficient basis from which this Court can find the existence of a debt. Declarations do not provide "reliable indicia of a debt which indicate the intrinsic economic nature of the transaction." *Alterman Foods, Inc. v. United States,* 505 F.2d 873, 877 (5th Cir.1974) citing *Fin Hay Realty Co. v. United States,* 398 F.2d 694, 697 (3rd Cir.1968).

---

**11.** *K & R Service Co., Inc.* found determination of whether a transaction qualifies under Tres. Reg. § 1.166–(c) "necessitates consideration of a number of different factors." [citation omitted] The many relevant criteria enumerated in the case law, see, eg. [sic] *In re: Uneco, Inc.,* 532 F.2d 1204, 1208 (8th Cir., 1976), *Smith v. Commissioner,* 370 F.2d 178, 190 (6th Cir., 1966), fall roughly into three categories: (1) the intent of the parties; (2) the form of the instruments; and (3) the objective economic reality. *K & R Service Co.,* 568 F.Supp at 41.

■ Indebtedness is indicated by the issuance of a bond, debenture, or promissory note. *In re: Lane*, 742 F.2d 1311 (11th Cir.1984). The absence of an assignment of security has been viewed by many courts as a key factor against finding bona fide indebtedness. *Piggybank Stations, Inc., supra; Matter of Uneco, Inc., supra; Johnson, supra.* The issuance of an unsecured note due on demand and containing no specific maturity date and no payment is insufficient evidence of a genuine debt. *Stinnett's Pontiac v. C.I.R.*, 730 F.2d 634, 638 (11th Cir.1984), *Accord, In re: Lane, supra.* *Stinnett* adopted the 5th Circuit rule in *Dillin v. United States*, 433 F.2d 1097 (5th Cir.1970), that "the presence of a definite maturity date in a definite obligation to repay is a highly significant feature of a debtor-creditor relationship," *Stinnett's Pontiac*, 730 F.2d at 638, and that the absence of the date militates against a finding of a bona fide debt. *Id. Accord, In re: Lane, supra.* See also, *Caligiuri*, 549 F.2d at 1157. We find the April 1, 1972 note lacks the essential character of a bona fide debt outlined in *Stinnett.* It is unsecured, contains no maturity date and as the testimony and exhibits reveal, although payments to the corporation have been recorded on the corporation's ledgers, the numbers recorded are at best questionable.

The Trustee contends the $1.1 million in payments recorded on the corporation's general ledger is the best indicator of the validity of the transactions. A corporation's general ledger will usually reveal how payments on the receivables have been treated by the corporation. The government asserts, and this Court agrees, that in these proceedings the corporate ledger is not a beacon in the Debtor's troubled financial night enlightening the Court of the Debtor's financial affairs. At best the light is but a flickering flame giving way to the vast darkness which abounds.

The ledger sheets do not reconcile the differences between Barbara's testimony that promissory notes were periodically issued and subsequently refinanced by a blanket note and the trustee's contention that the April 1, 1972 note relates to previous or future withdrawals from the corporation. There is no record that the promise to pay $104,962.83 was issued to cover the loan balance outstanding at the close of the 1971 fiscal year. There is no clear evidence that the note envisions future withdrawals[12] from the corporation or that the payments were distributed to both principal and interest as provided for by the terms of the note.

■ A debtor has the right to direct the application of a payment before or at the time of payment. *Federal Land Bank of St. Louis v. Wilson*, 719 F.2d 1367, (8th Cir.1983); *In re: American Gypsum Co.*, 36 B.R. 360 (Bkrtcy.D.N.M.1984); *In the Matter of Goehring*, 23 B.R. 323 (Bkrtcy. W.D.Mich.1983). Where the debtor provides written instructions or has agreed with the creditor on how a payment is to be applied, and the creditor accepts the payment, the creditor is obligated to apply the payment as directed and cannot change or revoke that direction without the consent of the debtor. *American Gypsum Co., Inc.*, 36 B.R. at 362. A debtor can communicate instructions on how the payment is to be applied by simply recording the note number or date of the note on the checks. *Id.* In these proceedings the cancelled checks of the payments have not been introduced into evidence. There is no indication whether Barbara directed or understood the payments were to be applied to the April 1, 1972 note, or other notes said to have been issued, or applied against previous loan receivables.[13]

---

**12.** Conceivedly the note could have been an attempt to refinance the "loans" outstanding as of January 31, 1972 and included loans made from February 1, 1972 thru April 1, 1972. But the Trustee has not directed the Court to language within the note allowing future withdrawals. Absent the Board's minutes, the only language envisioning future activity relating to the note is the wholly ambiguous language discussed on page 4, footnote 4, *supra.*

**13.** The Trustee has argued that the accrued interest on the note was paid by Barbara and that an interest deduction was taken on his personal

Our concern for the general ledger is warranted by Goldstein's testimony that he never saw a promissory note; never inquired about the validity of the loans; and that upon inquiry about repayments of the withdrawals was told that a program would have to be worked out at some time in the future. He testified that in his opinion in the early years Barbara could easily repay the outstanding loan balances. He also testified that although some form of repayment plan was in effect during the early years, the frequency of payment was uncertain; and that as the loan balances increased, the sporadic payments were minuscule in comparison to the tenfold increase in the loan receivables to Barbara in 1980. By that time, Barbara's payments were made solely from future advances from the corporation. (See Deposition transcript at pp. 38 & 39) Under the facts presented here, the recording of payments on the general ledger is neither a proof of a plan of a repayment nor an indicator of Barbara's intent to repay the corporation. When repayment is possible solely by future advances, the withdrawals lose all semblance of loans and take on the character of dividends. *Stinnett, supra.*

The plan and means of repayment runs further afoul when viewed against the backdrop of the economic reality of the Debtor. The three factors of the *Johnson* test, whether transfers were made in proportion to stockholdings, the corporation's history with respect to dividends, and the availability of earnings and profits from which the corporation could pay dividends, would normally be significant factors in determining the economic position of the debtor. Here, however, the parties agree that the withdrawals were made in proportion to Barbara's stockholdings; and the corporation's history as to dividends and payment of dividends is of little consequence. The economic reality of the Debtor is revealed by Barbara's admissions.

■ Barbara admitted all counts of the criminal information and the consent judgment entered by the State Grievance Commissioner as to the unlawful use of client trust funds for business and personal use. As early as 1974 client trust funds were intermixed and laundered through the general account and later became the only means of repaying the corporation. The array of activity to pay corporate expenses amounted to a kiting of funds to maintain the corporation. Barbara was soon faced with a trilemia of problems: suspension from the practice of law, criminal charges, and the loss of the firm which he had founded. In our view, application of the *Johnson* test reveals the parties did not possess the subjective intent to create a bona fide debt at the time the withdrawals were made.

Assuming, for the moment, that the withdrawals are loans, we find the debt did not become worthless in fiscal year 1980. A finding that a debt is worthless requires consideration of "all pertinent evidence, evidence of the value of the collateral, if any, securing the debt and the financial condition of the debtor are to be considered." *Estate of Mann,* 731 F.2d 267, 275 (5th Cir.1984). The Debtor must determine that the debt has lost all potential value. "Debts are wholly worthless when there are reasonable grounds for abandoning any hope of repayment in the future, *Dallmeyer v. Commissioner,* 14 T.C. 1282, 1292 (1950), and it could thus be concluded that they have lost their last vestage of value." *Estate of Mann,* 731 F.2d at 276, citing *Bodzy v. Commissioner,* 321 F.2d 331, 335 (5th Cir.1963). The burden is on the debtor to show some identifiable event demonstrating the worthlessness of the debts. *Holland v. C.I.R.,* 728 F.2d 360, 362 (6th Cir.1984); *Estate of Mann,* 731 F.2d at 276.

■ We agree with the Trustee that the Debtor need not be an extreme optimist about collecting on the debt. But absent

income tax. Despite Barbara's testimony that interest was paid, the general ledgers fail to make clear how much interest was paid. Further, because Barbara's personal income tax re-

turns have not been produced, the Court cannot determine the amount of interest deduction taken.

**194**

from the record before the Court is any attempt by the Debtor to collect on the debt or a showing that the assets acquired by Barbara had been seized by other creditors. Suspension from the practice of law is not an indicator of the worthlessness of a debt. Moreover, it is difficult for the Court to find a debt uncollectible where, as here, the Debtor seeking the deduction has agreed to pay $3,365,000 to redeem shares which were part of Barbara's "substantial net worth." This is especially true in light of the stock purchase agreement being signed just days after the close of the Debtor's 1980 fiscal year and weeks before the effective date of suspension.[14]

■ The Court also finds the Debtor, by the terms of the stock purchase agreement, had the right to set off the debt owed by Barbara prior to the maturity date of the agreement. "A right to equitable set off [sic] attaches where mutual demands exist and where insolvency has intervened even though one of the demands has not yet matured." *American Surety Company of New York v. City of Akron,* 95 F.2d 966, 970 (6th Cir.1938).

Our findings foreclose any further discussion on the Trustee's arguments relating to estoppel and statute of limitations. Accordingly, we find the withdrawals from the corporation to Peter R. Barbara to be dividends for purposes of 26 U.S.C. § 166.

The bad debt deduction is DISALLOWED and the motion is DENIED.

IT IS SO ORDERED.

---

**14.** The Court does not overlook the testimony of Fred J. Dery, a certified public accountant, regarding the insolvency of the Debtor. The Trustee proffered the testimony and the insolvency report (Exhibit C) to show the debt was uncollectible. Dery testified and Exhibit C reveals, that the audit was not according to generally accepted auditing standards or GAAS. The letter provides in pertinent part:

Our examination does not include the application of audit procedures sufficiently comprehensive to constitute an examination in accordance with generally accepted auditing standards. Had we performed additional procedures or made an examination of the financial statements in accordance with generally accepted auditing standards, matters might have come to our attention which would require disclosure.
*Because the above procedures do not constitute an examination made in accordance with gen-*

*erally accepted auditing standards, we do not express an opinion on any of the accounts referred to above.* This report relates to the items specified above and does not extend to any financial statements taken as a whole. (Emphasis added)

Dery prepared an accountant compilation audit which in his opinion was the lowest level of audit to be performed. In contrast to an audit prepared according to GAAS, compilation reports are generally viewed as the representations of management and, therefore, management has the responsibility for them. *How to Find Negligence and Misrepresentations in Financial Statements,* § 4.27, Irving Kellogg, Esq., CPA (1979), (Supplement 1984). Coupled with our finding on the general ledger, the Dery testimony and report adds little to Debtor's cause.