*1368
 
 FRIEDMAN, Circuit Judge.
 

 This appeal from the United States Claims Court
 
 *
 
 presents the oft-recurring question whether advances by a stockholder to its corporation constituted debt or equity. Here a corporation made advances to its wholly owned subsidiary. When it subsequently liquidated the subsidiary and determined that the assets it received from the subsidiary were virtually worthless, the corporation took a bad debt deduction for the advances. The Internal Revenue Service (the Service) disallowed the deduction, ruling that the advances were not loans to, but equity investments in, the subsidiary. The trial judge reversed that determination, holding that the advances were loans. We affirm.
 

 I.
 

 The trial judge’s findings, which the parties stated at oral argument they do not challenge (except perhaps one finding that is immaterial to our decision) and which we summarize below, set forth the pertinent facts.
 

 A. 1. The taxpayer, Electronic Modules Corporation (EMC), was organized in 1961 to provide engineering services for the electronics industry. From 1964 to 1967, EMC grew significantly and expanded its operations. “Over the years, EMC ... prospered ...,” and by 1968, its assets included $410,-357 in cash. Fdg. 4(A). Through 1967, however, the predominant share of EMC’s business (70 percent) came from the federal government. Fdg. 3(E). “Because of its growth[,] ... success ...,” and its reliance on government orders, EMC was “under a great deal of pressure to acquire other companies.” Fdg. 4(B). “EMC had two objectives in its expansion program: (1) development of revenues from sources other than Government and Government-subcontracted sales, and (2) ownership of a line of proprietary products which would enable it to become more than a service business to other corporations.” Fdg. 5.
 

 In 1968, EMC acquired International Technology, Inc. (IT). Organized in 1964 as a research facility, IT “had developed broad patent coverage on a proprietary line of conductive plastics or elastomers.” Fdg. 7(B). A conductive elastomer is a plastic, steelwool-like material which can be formed into a wire, and has electrical characteristics which “make it an infinite connector and conductor of electricity.” Fdg. 7(B). IT’s patented invention “had potential application for a wide variety of uses,” and by 1968, IT “had developed working prototype models of four new products: an electrified visual display board; a Christmas tree lighting set; an electric dart board; and a baseboard wiring assembly.” Fdg. 7(C).
 

 IT’s president sought an outside investor to infuse working capital into the company, which was in relatively poor financial shape. “During 1968, IT sustained a loss of $171,999.46, while the deficit accumulated during the previous three years was $169,-138, for a total accumulated deficit of $341,-138.25.” Fdg. 20(B). Moreover, IT also had a negative net worth at the time of the acquisition; “its liabilities exceeded its assets by $115,984.” Fdg. 17(d). In her opinion, the trial judge stated that “IT was in need of cash
 
 (i.e.,
 
 an improvement in its cash flow) to meet day-to-day operation expenses. For this reason, during the period of negotiations concerning acquisition, EMC and its officers loaned or advanced approximately $15,000 to IT.” These advances are not at issue here.
 

 EMC made the acquisition to exploit possible commercial applications of IT’s products. While “[t]he only product produced and sold [by 1968] ... was the display board,”
 
 id.,
 
 IT had developed “extensive contacts and potential marketing arrangements” for several of the other products (including an exclusive marketing agreement and a licensing agreement). Fdg. 9. “These exclusive marketing arrangements convinced EMC’s executives that there was a ready market for IT’s products.” Fdg. 10.
 
 *1369
 
 During the negotiations for the acquisition, one IT official indicated that “several million dollars worth of sales for IT’s products could be obtained if IT could be geared for high-volume production and certain technical problems could be solved.... EMC’s representatives relied upon representations concerning the ready market for IT’s products and, based on their own strong engineering backgrounds, were confident that EMC could easily solve all of the cost and technical problems involved.” Fdg. 15(A). EMC “acquired IT for valid business reasons ... [not] to produce a tax loss.” Fdg. 16. ■
 

 EMC acquired IT in a stock-for-stock exchange. Fdg. 17(C). EMC transferred shares of its stock with a fair market value of $264,957 to the shareholders of IT in exchange for all outstanding shares of IT common stock. After the acquisition, IT continued its corporate existence as an EMC subsidiary. In her opinion, the trial judge concluded that the acquisition did not “materially change IT’s basic financial situation.”
 

 2. From 1968 to 1971, EMC advanced to IT $493,257 “to finance [the company’s] day-to-day operations, including (1) some research and development ($52,418 in 1969, and $62,378 in 1970) with respect to either improving existing products or developing new products, (2) salaries, (3) inventory acquisition, and, in the latter stages, (4) to wind up production [approximately $91,334] after deciding to discontinue any further development of IT’s patent and to complete a contract with HUD. The only fixed asset obtained through these funds involved payment [of approximately $10,000] for an Italian [manufacturing] press____” Fdg. 40.
 

 The advances were not “evidenced by any promissory note[s] and no interest was charged,” fdg. 51, but were carried on EMC’s books as “Accounts Receivable-International Technology,” and on IT’s books as either “Note Payable-E.M.C.” or “Accounts Payable EMC” under “Long Term Liabilities.” Fdg. 41. Since IT did not have its own accountants, EMC’s accounting department maintained IT’s books and records. Fdg. 51.
 

 “Robert Vogel [president of EMC] testified that EMC considered these advances (characterized in testimony as ‘support’ payments or as ‘capital infusion’) as loans and expected to be repaid.” Fdg. 42. Further, “[i]t was understood that EMC would advance to IT whatever funds were needed in order to enable ongoing operations and that these advances would be repaid as soon as IT became ‘profitable’ or in a cash-flow position to enable repayment.” Fdg. 51. In 1971, IT paid back approximately $30,000 of the advances, thus leaving $463,257 unpaid at the time of IT’s subsequent liquidation. Fdg. 39.
 

 3. IT’s sales increased from $4,341 in the year ending October 1, 1969, to $93,448 in the year ending December 30, 1971. Between the fiscal years 1970 and 1971, IT’s gross loss of $50,464 became a profit of $9,392, and its net loss of $72,293 was reduced to $10,132. Fdg. 34. Major national manufacturers had shown an interest in IT’s product. “IT had an extensive marketing program with assigned territories, licensing agreements and other exclusive marketing arrangements,” and also a $90,-000 contract with the Department of Housing and Urban Development under which IT “could develop its innovative baseboard wiring assembly.” Fdg. 38. “The constant increase in sales coupled with the decrease in net losses gave EMC a reasonable expectation that profits would be forthcoming in the near future.”
 
 Id
 

 However, a host of problems — technical and design flaws, high costs, lack of consumer interest, and potential legal liability — prevented the development of marketable products based on the IT inventions. Fdgs. 23-27, 30. As a consequence, EMC’s expectations that IT would turn a net profit were never realized. Fdgs. 35, 48.
 

 4. In September 1970, the EMC Board of Directors, after learning of IT's most recent deficit, decided that, “under the circumstances, IT’s operations would be moved into the EMC building in order to reduce costs and improve communications. Further discussions were held regarding the
 
 *1370
 
 chronic problems which had occurred [in trying to develop marketable products based on the IT inventions] and it was unanimously agreed that positive results must be forthcoming within the next 30 to 90 days or the IT operations should be severely curtailed and/or the possibility of the sale of IT to a more suitable party should be pursued.” Fdg. 53. In the fall of 1970, EMC also “discontinued further development of IT’s products.” Fdg. 50. In December, it replaced IT’s president, and the new man was “assigned to salvage what he could of IT’s operations, and to complete the HUD contract.” Fdg. 50.
 

 At an August 1971 EMC board meeting, the chairman referred to “the questionable prospect of [IT] generating any profits currently or in the future by following the existing pattern of its activities,” and the board decided to liquidate the subsidiary by September 30. Fdg. 55. IT was liquidated on that date, and EMC received IT’s assets and assumed its liabilities. Fdg. 59.
 

 Upon the liquidation, EMC valued IT’s assets at approximately $40,000. Trial judge’s opinion, p. 20. It valued the IT patent at one dollar, “based on the various production and sales difficulties ... encountered by IT .... ” Fdg. 60. It gave no value to the HUD contract. Approximately three years later, EMC sold most of the assets it had acquired from IT for $25,-000. Fdg. 89.
 

 B. In its 1971 federal income tax return, EMC claimed a bad debt deduction for the losses it suffered when, upon the liquidation of IT, it received property worth only $40,-000 in return for the net advances of $463,-257 (total advances of $493,257 less the $30,-000 repaid) it had made to IT. EMC sought to carry back a portion of those losses to earlier years, and claimed a refund for 1969 of $227,561.91. The Service disallowed $355,588 of the loss carryback on the ground that the advances were not loans but additional capital investment. The Service further stated that section 332 of the Internal Revenue Code of 1954, 26 U.S.C. 332, which bars recognition of gain or loss “on the a of distributed in complete liquidation of another corporation,” “applied to the liquidation of IT by EMC.” Fdg. 96. .
 

 The Service subsequently assessed a deficiency of $183,460 against EMC. EMC paid the deficiency, filed a claim for refund and, after the Service denied the refund, filed the present suit.
 

 C. After trial, the trial judge held that EMC’s advances to IT constituted debt rather than equity. She pointed out that the determination whether advances were loans or equity investments depended upon all the facts in the particular case, and that no single factor was dispositive. The opinion discussed various factors that suggested opposite conclusions.
 

 The factors indicating debt were (1) there was a bona fide business reason for the advances; (2) the parties intended the advances to be debt, as evidenced by the way they recorded them on their books and records; (3) the funds were used mostly for daily operating expenses, with “very little, if any, money” being used for capital outlays; and (4) EMC and IT “clearly anticipated repayment of the sums advanced.”
 

 The factors indicating equity were (1) there were no notes or other evidence of indebtedness, no interest was payable, and there was no specified time for repayment; (2) IT had a negative net worth and was thinly capitalized when EMC acquired it; (3) EMC did not acquire IT “in a manner designed to infuse working capital” into the company; and (4) an arm’s-length lender would not have made loans to IT on the terms that EMC made the advances.
 

 “Based on the foregoing discussion,” the trial judge concluded that “EMC’s advances to IT represented an ‘indebtedness’ of IT and not a capital investment.”
 

 The trial judge further held, and the parties do not dispute, that “IT’s debts to EMC were essentially worthless” when IT was liquidated. She held that “the minimal or nominal values” EMC gave to the property it acquired from IT “are well-based” on the record. The trial judge therefore concluded that EMC is entitled to a bad debt deduc
 
 *1371
 
 tion for the amount of IT’s indebtedness. The trial judge did not discuss the Service’s alternative ground for denying the bad debt deduction, i.e., that section 332 of the Code barred it.
 

 II.
 

 The government makes a preliminary argument, based upon “[t]wo interrelated accounting formulae,” that all the advances were payments by EMC of the purchase price of IT stock, and therefore, could not be loans to IT. It contends that since IT had a negative net worth of approximately $115,000 at the time of the acquisition, EMC’s purchase price was $380,000, consisting of the value of the EMC stock issued (approximately $265,000) plus the $115,000 representing the excess of IT’s liabilities (which the government states EMC assumed) over its assets.
 

 It is unnecessary to set forth the intricate analyses and calculations by which the government reaches this conclusion, since the government’s theory is invalidated by fundamental flaws.
 

 EMC did not purchase IT’s business and assets from that company. Instead, it acquired all of IT’s stock from IT’s stockholders in exchange for EMC stock. EMC made the advances to IT, not to the former IT stockholders. If the advances were payments of the purchase price, they would have gone to the latter and not to the former.
 

 Moreover, there is nothing to indicate that the price EMC paid for the IT stock was more than the value of the EMC stock it gave in exchange. However IT’s negative net worth may have been treated for accounting purposes, EMC in fact did not assume any of IT’s liabilities through the acquisition of IT’s stock. That is an elementary concept of corporation law, and unless EMC agreed in the acquisition agreement to assume those liabilities (which it did not), the purchase price cannot be artificially inflated by $115,000.
 

 Finally, accounting concepts are not determinative of whether stockholder advances are loans or capital investments. Indeed, if resort is to be had to accounting treatment in making that determination, a more pertinent inquiry would be how the parties treated the advances on their own books and records. As noted, they treated them as debt, not equity.
 

 III.
 

 The Court of Claims has recognized that in the debt-equity area of federal tax law, “each case must rest and be decided upon its own unique factual flavor, dissimilar from all other, for the intention to create a debt is a compound of many diverse external elements pointing in the end to what is essentially a subjective conclusion.”
 
 American Processing and Sales Co. v. United States,
 
 371 F.2d 842, 848 (Ct.Cl.1967). “The law is well established that the debt-versus-equity problem is basically a question of fact, to be determined in the light of all the facts and circumstances of the particular case .... ”
 
 Sayles Finishing Plants, Inc. v. United States,
 
 399 F.2d 214, 218 (Ct.Cl.1968).
 
 See also Diamond Bros. Co. v. Commissioner,
 
 322 F.2d 725, 730 (3d Cir.1963);
 
 Gilbert v. Commissioner,
 
 262 F.2d 512, 513 (2d Cir.),
 
 cert. denied,
 
 359 U.S. 1002, 79 S.Ct. 1139, 3 L.Ed.2d 1030 (1959).
 

 Although the courts have considered various factors in making the debt-equity determination, they have recognized that these criteria “are only aids”, in performing that function.
 
 Fin Hay Realty Co. v. United States,
 
 398 F.2d 694, 697 (3d Cir.1968). “There is no one characteristic ... which can be said to be decisive in the determination of whether the obligations are risk investments in the corporations or debts.”
 
 John Kelley Co.
 
 v.
 
 Commissioner of Internal Revenue,
 
 326 U.S. 521, 530, 66 S.Ct. 299, 304, 90 L.Ed. 278 (1946).
 

 A. One element that the courts, including the Court of Claims, have considered essential to a determination that the advances were loans is that the lender had “a reasonable expectation of repayment that does not depend solely on the success of the borrower’s venture.”
 
 American Processing,
 
 371 F.2d at 856. (This factor sometimes is
 
 *1372
 
 described as the risk-of-the-business factor; see
 
 Slappey Drive Industrial Park v. United States,
 
 561 F.2d 572 (5th Cir.1977).) The government contends that the trial judge failed to consider this factor at all, or that if she did consider it, she did not give it sufficient weight.
 

 1. In dealing with the expectation-of-repayment factor, the trial judge stated that the present case “may be more similar to
 
 American Processing and Sales Co.,
 
 than to any other case.” She then quoted a lengthy passage from the opinion in
 
 American Processing
 
 in which the court, after stating the expectation-of-repayment standard quoted above, discussed various facts indicating that the lender “placed justified confidence in [the borrower’s] future ability to repay the heavy advances for operating costs.” 371 F.2d at 856. The facts to which the court referred were that “fledgling enterprises often experience losses in their formative periods when they are incurring expenses for programs designed to expand into eventually profitable operations,” that the borrower had attempted to expand various segments of its business, and that its sales volume “showed dramatic increases.”
 
 Id.
 
 The trial judge also quoted the statement in
 
 American Processing
 
 that “[c]ases abound where ‘indebtedness’ was found despite the weak financial condition and operating losses of the debtor corporations.”
 
 Id.
 
 The trial judge then stated:
 

 In the instant case, particularly, it is noted that the initial acquisition of IT was accompanied by optimistic — and not unjustified — expectations, on the part of EMC, for the successful production and marketing of certain proprietary products. These expectations continued through subsequent product development and research, as well as market exploration — at least until the eventual denouement.
 

 The corporations, thus, clearly anticipated repayment of the sums advanced.
 

 Although the trial judge did not explicitly state that EMC’s “anticipated repayment of the sums advanced” did “not depend solely on the success of the borrower’s venture,” her opinion fairly may be interpreted as so holding. She viewed the case as similar to
 
 American Processing,
 
 and noted parallels between the situation there and here that showed that EMC “clearly anticipated repayment of the sums advanced.” In the light of her discussion and analysis, the latter statement also implicitly included the conclusion that the expectation of repayment did not depend solely on IT’s success. The taxpayer here therefore cannot be equated to the taxpayer in
 
 American-La France-Foamite Corp. v. Commissioner,
 
 284 F.2d 723 (2d Cir.1960),
 
 cert. denied,
 
 365 U.S. 881, 81 S.Ct. 1031, 6 L.Ed.2d 192 (1961), as the government seeks to do, since in the latter case the court viewed the recipient of the advances as having “no prospects other than the success of the venture.” 284 F.2d at 725.
 

 2. We cannot say that the trial judge gave insufficient weight to the likelihood-of-repayment factor. The determination whether advances are loans or equity investments depends upon all the facts. The trier of the facts cannot be faulted because she gave a particular factor more or less weight than we might give it if we were deciding the case
 
 de novo.
 
 As noted,
 
 supra
 
 at p. 1371, there is no single factor that is decisive on the issue. “[Ljikelihood of ultimate repayment [that] is [not] dependent upon the success of the recipient ... is only ,. one factor to be considered .... ”
 
 Jack Daniel Distillery v. United States,
 
 379 F.2d 569, 583 (Ct.Cl.1967).
 

 “Each case turns on its own facts; differing circumstances may bring different factors to the fore.”
 
 Slappey Drive Industrial Park,
 
 561 F.2d at 581. The weighing of different factors is a task committed largely to the discretion of the trial court, and one that an appellate court is ill-equipped to perform.
 
 Diamond Bros. Co.,
 
 322 F.2d at 730.
 
 Cf. Secretary of Agriculture v. Central Roig Refining Co.,
 
 338 U.S. 604, 610-14, 70 S.Ct. 403, 406-408, 94 L.Ed. 381 (1950).
 

 B. We also have no basis for rejecting the trial judge’s ultimate determination,
 
 *1373
 
 reflecting her evaluation of the pertinent factors, that EMC’s advances to IT were loans rather than equity investments. As indicated in the statement of facts, some of the factors indicated that the advances were one and some indicated the other.
 

 The factors supporting the trial judge’s conclusion were that there was a valid business purpose for the advances; that IT repaid part (although only a small part) of them; that the parties intended the advances to be loans, as shown by their treating them as such on their books and records; that most of the advances were used to provide working capital to meet ordinary expenses rather than to purchase capital assets; and that EMC had a reasonable expectation, not solely dependent on IT’s business success, that IT would repay the advances. The fact that other factors pointed toward the opposite conclusion (i.e., that the advances were equity investments) is not a sufficient justification for rejecting the trial judge’s determination that, considering all the factors, the advances were loans.
 

 IV.
 

 As noted, the Service gave the additional reason for ruling that the advances were equity investments that section 332 of the Code barred EMC from taking a bad debt deduction upon the liquidation of IT. The trial judge did not discuss the point, and the government did not argue it before us. Accordingly, the government must be deemed to have abandoned the contention. We therefore do not discuss it or indicate any views on it.
 

 The judgment of the Claims Court is affirmed.
 

 AFFIRMED.
 

 *
 

 Pursuant to order of this court dated October 4, 1982, Trial Judge Yannello, on October 8, 1982, entered a final judgment in accordance with her recommended decision of July 29, 1981. We treat the government’s exceptions to that decision as an appeal from that judgment.