T.C. Memo. 2000-235


UNITED STATES TAX COURT


PHILIP A. SELLERS AND ESTATE OF CAROLINE R. SELLERS, DECEASED,
PHILIP A. SELLERS, EXECUTOR, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 17064-97.                    Filed August 3, 2000.


<u>William B. Sellers</u>, for petitioners.

<u>Joseph Ineich</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


THORNTON, <u>Judge</u>:  Respondent determined deficiencies in petitioners' Federal income tax and accuracy-related penalties under section 6662 for taxable years 1993 and 1995 as follows:

| Year | Deficiency | Penalty Sec. 6662(a) |
|------|-----------|----------------------|
| 1993 | $49,843 | $9,969 |
| 1995 | 9,567 | 1,913 |

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

After concessions,[1] the issues for decision are:

1. Whether the notice of deficiency inadequately described the basis for respondent's determinations, so as to justify placing the burden of proof on respondent.

2. Whether advances that petitioner husband (hereinafter petitioner) made to a related corporation are deductible as bad debts under section 166.

3. Whether advances that petitioner made to a related corporation are deductible as ordinary losses under section 165.[2]

---

[1] Respondent concedes that petitioners' losses from the advances at issue are long-term capital losses that are deductible under sec. 165(f), subject to the limitations of sec. 1211. Petitioners have failed to address, either at trial or on brief, respondent's assertion of sec. 6662 accuracy-related penalties. We treat their failure to argue as, in effect, a concession of this issue. See Rule 151(e)(4) and (5); Sundstrand Corp. v. Commissioner, 96 T.C. 226, 344 (1991).

[2] Respondent's disallowance of petitioners' net operating loss carryover deduction for 1995 appears to be a computational matter, depending entirely on our resolution of the proper income tax treatment of petitioner's advances to the related corporation.

## FINDINGS OF FACT

The parties have stipulated some of the facts, which are incorporated in our findings by this reference. When they filed their petition, petitioners were married and resided in Montgomery, Alabama. Subsequent to filing the petition, Caroline R. Sellers died. The Estate of Caroline R. Sellers has been substituted as a party.

Petitioner's Background

Since 1947, petitioner has been in the investment banking business, making loans to companies and individuals. Since at least 1968, petitioner has made loans through his sole proprietorship, Continental Mortgage Co. (Continental Mortgage).

Petitioner is also a 75-percent shareholder of Philip A. Sellers & Co., Inc. (PASEL), which engages in investment banking. His son, Philip L. Sellers (Philip), owns the remaining 25 percent of PASEL. PASEL owns all the stock of Merchant Capital Corp. (Merchant Capital), an investment banking business with a concentration in municipal type business.

The Gandy's Acquisition

In 1987, PASEL acquired a 67-percent ownership interest in Kenneth H. Bauer & Associates, Inc. (KHB), a newly organized Georgia corporation formed for the purpose of acquiring interests in existing businesses, including Gandy's Industries, Inc. (Gandy's), a Georgia corporation that manufactured pool tables

and related equipment.  PASEL acquired its 67-percent ownership interest in KHB as partial consideration for a $544,000 loan that it made to KHB to facilitate KHB's leveraged buy-out of Gandy's.[3] The other 33-percent ownership interest in KHB was held by its president and director, Steven K. Bauer (Bauer).  KHB, which had no assets other than its ownership interest in Gandy's, then took Gandy's name.  Consequently, PASEL and Bauer then held ownership interests in Gandy's of 67 percent and 33 percent, respectively.

KHB acquired Gandy's through the issuance of $5,040,000 in Macon-Bibb County Industrial Revenue Bonds (the Gandy's bonds). The underwriter of the Gandy's bonds was Merchant Capital, which, as previously described, was a wholly owned subsidiary of PASEL.

In 1988 and 1989, petitioner and PASEL made separate loans to Gandy's totaling over $250,000.  Bauer, who was then Gandy's president, cosigned for the loans in his individual capacity. The loans were not repaid, and judgments were entered against Bauer, resulting in the transfer to PASEL of Bauer's ownership interest in Gandy's.[4]  At some time not specified in the record,

---

[3] On Dec. 17, 1987, Philip A. Sellers & Co., Inc. (PASEL), lent $544,000 to Kenneth H. Bauer & Associates (KHB), pursuant to a promissory note, bearing 11 percent interest, with principal and accrued interest payable in two installments on Mar. 17, 1988, and Dec. 17, 1988.  On July 1, 1988, this loan was repaid in full.

[4] On June 24, 1988, petitioner lent $150,000 to Gandy's Industries, Inc. (Gandy's) pursuant to a promissory note, payable in 60 days with 11 percent interest.  The note is signed by
(continued...)

Philip became president of Gandy's and remained in that position during the years in issue.[5]  Sometime prior to 1993, in a manner not revealed in the record, Merchant Capital became a 50-percent owner of Gandy's.

## The Advances in Question

Gandy's never produced enough income to pay any of the interest on the $5,040,000 Gandy's bonds.  After June 1, 1988, Gandy's was delinquent on its bond interest payments.[6]  Philip handled most of the negotiations with the bondholders with respect to Gandy's failure to make payments on the bonds.

In 1990, petitioner was aware that because of a nationwide recession and because of Gandy's heavy debt repayment burden relating in part to the bond project, Gandy's was experiencing

---

[4](...continued)
Steven K. Bauer (Bauer) both in his capacity as president of Gandy's and in his individual capacity.  The note was not repaid, and petitioner sued Bauer.  On Feb. 20, 1990, judgment was entered for petitioner.

On Mar. 22, 1989, PASEL lent $104,000 to Gandy's pursuant to a promissory note payable in monthly installments of $10,000 plus accrued interest, beginning Apr. 1, 1989.  The note was cosigned by Bauer in his individual capacity.  The note was not repaid. PASEL sued Bauer and obtained a judgment that included the transfer of Gandy's stock.

[5] It is unclear from the record what continuing involvement, if any, Bauer had in Gandy's during the years in issue.

[6] The Gandy's project bonds bore interest from Dec. 1, 1987, at a per annum rate of 11 percent, payable semiannually on Dec. 1, 1987, and June 1 of each year, commencing June 1, 1988.

cash-flow problems and was struggling to survive.  Because its assets had already been leveraged, Gandy's was unable to obtain financing from financial institutions.  In 1990, petitioner, either directly or through his wholly owned corporation Continental Mortgage, advanced $300,000 to Gandy's as follows:

| Date | Amount |
|------|--------|
| 7/30/90 | $100,000 |
| 8/13/90 | 40,000 |
| 8/13/90 | 60,000 |
| 12/11/90 | 100,000 |

Each of these four advances (the 1990 advances) was evidenced by a promissory note, each stating an 8-percent interest rate.  The July 30, 1990, promissory note indicates a due date of December 31, 1991.[7]  The December 11, 1990, promissory note indicates a due date of December 11, 1991.  The other two promissory notes were payable on demand.

Gandy's used the 1990 advances for working capital and to meet daily operating expenses.

During 1991 or 1992, Gandy's made no repayments of the 1990 advances.  During 1991 and 1992, neither petitioner nor any other party made any additional advances to Gandy's.

---

[7] The note in the record regarding the July 30, 1990, advance is dated Dec. 31, 1990, and bears a handwritten notation that it "covers wire of 7/30/90".

On January 7, 1993, and January 27, 1993, petitioner made two additional advances to Gandy's of $25,000 each. Neither advance is evidenced by a note.

On December 2, 1993, petitioner wired an additional $10,483 to a broker to pay shipping charges on slate from Italy that Gandy's had ordered for use in the manufacture of pool tables. This advance is evidenced by a demand note bearing 8 percent interest.

Although Gandy's was in default on two of petitioner's advances after December 31, 1991, petitioner did not sue Gandy's for collection or otherwise demand payment of principal or interest with respect to any of the advances.

Petitioner's advances to Gandy's from 1990 through 1993 were all unsecured, because Gandy's had pledged all its assets to other lenders. Petitioner's advances to Gandy's were subordinated to the Gandy's bonds.

Gandy's treated all the advances in question (with the possible exception of the $10,483 advance of December 2, 1993) as shareholder debt and accrued interest thereon.[8] It was Gandy's intention to repay the advances as soon as Gandy's started producing positive cash-flow. This never happened. On its September 30, 1991, and September 30, 1992, Forms 1120, U.S.

---

[8] The record does not reveal how Gandy's treated the December 1993 advance of $10,483.

Corporate Income Tax Return, Gandy's reported net losses of
$1,205,578 and $1,412,516.  Near the end of 1993, Gandy's had
retained earnings deficits of approximately $4 to $5 million.

On December 23, 1993, Gandy's repaid $5,000 of petitioner's
advances.[9]  Otherwise, Gandy's repaid neither principal nor
interest on any of the advances made by petitioner from 1990
through 1993.

Default on the Gandy's Bonds and Foreclosure

Gandy's never made any interest or principal payments on
the Gandy's bonds.  On February 1, 1994, the Gandy's bonds
trustee declared Gandy's in default of its bond obligations and
foreclosed on Gandy's assets.  Philip purchased Gandy's assets
from the foreclosure, and Gandy's has continued to operate under
the name Macon Manufacturing.  In 1994 and 1995, petitioner
advanced additional, undisclosed sums to Macon Manufacturing.

Petitioners' Return Positions and Respondent's Determinations

On their 1993 joint Federal income tax return, petitioners
deducted $355,483 as a bad debt deduction and reported a net
operating loss of $169,331.[10]  On their 1995 joint Federal income
tax return, petitioners claimed a net operating loss of $177,794,

---

[9] The record does not reveal specifically to which advance
this repayment related.  Petitioner testified that the repayment
was allocated "to principal."

[10] This amount represents the total amount of money that
petitioner advanced to Gandy's in 1990 and 1993, less the $5,000
that Gandy's repaid in Dec. 1993.

of which $169,331 represented a carryover of the 1993 net operating loss.

In the notice of deficiency for taxable year 1993, respondent disallowed petitioners' claimed bad debt deduction "because it has not been established that any amount of bad debts existed in fact and in law." Similarly, for taxable year 1995, respondent disallowed the $169,331 claimed net operating loss carryover "because it has been determined that a net operating loss did not exist in the year that caused the carryforward."

OPINION

A. The Parties' Contentions

Petitioners argue that the advances to Gandy's were loans that petitioner made in the course of his lending business, that the loans became worthless in 1993, and that they are properly deductible either under section 166 as business bad debts or under section 165 as ordinary losses incurred in a trade or business.

Respondent agrees that petitioner was in the business of lending money but argues that the advances in issue represent contributions to Gandy's capital rather than debt. At trial and on brief, respondent concedes that petitioners are entitled to deduct the losses under section 165 but only as long-term capital losses, pursuant to section 165(f).

B. <u>Burden of Proof</u>

Under generally applicable principles, petitioners bear the burden of proving entitlement to a deduction resulting from petitioner's advances to Gandy's. See Rule 142(a); <u>United States v. Janis</u>, 428 U.S. 433, 441-442 (1976); <u>Welch v. Helvering</u>, 290 U.S. 111, 115 (1933); <u>Amey & Monge, Inc. v. Commissioner</u>, 808 F.2d 758, 761 (11th Cir. 1987), affg. T.C. Memo. 1984-642.

Petitioners argue that the notice of deficiency failed to set forth the reasons for respondent's determinations with sufficient specificity to satisfy the requirements of section 7522 and that respondent should therefore bear the burden of proof.

Section 7522(a) provides in relevant part that any notice of deficiency "shall describe the basis for, and identify the amounts (if any) of, the tax due * * *. An inadequate description under the preceding sentence shall not invalidate such notice."

The purpose of section 7522 is to give the taxpayer notice of the Commissioner's basis for determining a deficiency. See <u>Shea v. Commissioner</u>, 112 T.C. 183, 196 (1999). Here the notice of deficiency sufficiently apprised petitioners of the basis for respondent's deficiency determination and identified the amount of tax due. At trial, respondent has taken no position that would require petitioners to present evidence different from that

necessary to resolve the determinations that were described in the notice of deficiency, so as to justify placing the burden of proof on respondent.  Cf. Shea v. Commissioner, supra at 197. The burden of proof remains with petitioners.

C.    Bad Debt Deduction

A taxpayer generally may deduct a debt that becomes worthless within the taxable year.  See sec. 166(a)(1).  Whether a transfer of funds to a closely held corporation constitutes debt or equity is determined based on all relevant facts and circumstances.  The Court of Appeals for the Eleventh Circuit, to which an appeal of this case would generally lie, applies a nonexclusive 13-factor test as enunciated in Estate of Mixon v. United States, 464 F.2d 394, 402 (5th Cir. 1972).  See In re Lane, 742 F.2d 1311, 1314-1315 (11th Cir. 1984); Stinnett's Pontiac Serv., Inc. v. Commissioner, 730 F.2d 634, 638 (11th Cir. 1984), affg. T.C. Memo. 1982-314.  The Mixon factors are: (1) The names given to certificates evidencing the indebtedness; (2) the presence or absence of a fixed maturity date; (3) the source of payments; (4) the right to enforce payment; (5) the effect on participation in management; (6) the status of the contribution in relation to regular corporate creditors; (7) the parties' intent; (8) "thin" or adequate capitalization; (9) identity of interest between creditor and stockholder; (10) the source of interest payments; (11) the ability of the

corporation to obtain loans from outside sources; (12) the use to which the advances were put; and (13) the failure of the debtor to repay on the due date.  See also <u>Dixie Dairies Corp. v. Commissioner</u>, 74 T.C. 476, 493 (1980).

The identified factors are not equally significant, nor is any one factor determinative.  See <u>Estate of Mixon v. United States</u>, <u>supra</u>; <u>Dixie Dairies Corp. v. Commissioner</u>, <u>supra</u>.  The factors must be evaluated in light of all the facts and circumstances.  See <u>Dixie Dairies Corp. v. Commissioner</u>, <u>supra</u>.

1.  <u>Names Given to the Certificates</u>

The issuance of a note may be indicative of bona fide debt. See <u>Estate of Mixon v. United States</u>, <u>supra</u>.  The existence of a note, however, is not in and of itself conclusive.  An unsecured note, with payments thereon made long after the due date or else not at all, weighs toward equity.  See <u>Stinnett's Pontiac Serv., Inc. v. Commissioner</u>, <u>supra</u>; <u>Estate of Van Anda v. Commissioner</u>, 12 T.C. 1158, 1162 (1949), affd. per curiam 192 F.2d 391 (2d Cir. 1951).

Two of petitioner's 1993 advances, of $25,000 each, were not evidenced by any kind of debt instrument.  As applied to these two advances, this factor weighs toward equity.

The four 1990 advances were each evidenced by promissory notes,[11] as was the December 2, 1993, advance of $10,483. All the notes were unsecured. Apart from the $5,000 repayment made in late 1993, which was not allocated specifically to any of the notes, there were no repayments. When petitioner made the advances, either he singly, or else he and Philip together, owned all the interest in Gandy's, either directly or through their wholly owned corporations PASEL or Merchant Capital, which was also underwriter of the Gandy's bonds.[12] Throughout this period, Philip was president of Gandy's. Where a transaction involves a closely held corporation, the form and labels used may signify little, because the parties can mold the transaction to their will. See Anchor Natl. Life Ins. Co. v. Commissioner, 93 T.C. 382, 407 (1989). Accordingly, we assign little weight to the labeling of certain of the advances as notes.

2. The Presence or Absence of a Fixed Maturity Date

The presence of a fixed maturity date is indicative of debt but is not dispositive. See American Offshore, Inc. v.

---

[11] One of these notes indicates on its face that it was made some 6 months after petitioner had wired the principal amount to Gandy's, suggesting the absence of a "businesslike, arm's length transaction." Estate of Mixon v. United States, 464 F.2d 394, 403 (5th Cir. 1972).

[12] The record is unclear about the exact configuration over time of ownership interests in Gandy's among petitioner, Philip, and their corporations. Petitioners state in their reply brief that petitioner "eventually held all the [Gandy's] stock".

<u>Commissioner</u>, 97 T.C. 579, 602 (1991).  The absence of a fixed maturity date or repayment schedule may indicate a contribution to capital rather than a loan.  See <u>Stinnett's Pontiac Serv.,</u> <u>Inc. v. Commissioner</u>, <u>supra</u>; <u>Estate of Mixon v. United States</u>, <u>supra</u> at 404; <u>American Offshore, Inc. v. Commissioner</u>, <u>supra</u> at 602.

Five out of seven of petitioner's advances to Gandy's had no fixed maturity date and no repayment schedule.  The notes reflecting the other two advances had 1-year maturity dates, but the significance of this factor is diminished by Gandy's failure to make repayments in accordance with the maturity dates and petitioner's failure to make any efforts to collect.

This factor weighs against a bona fide debtor-creditor relationship.

3.  <u>Source of the Payments</u>

Repayment that depends on corporate earnings has the appearance of a contribution to capital.  See <u>Estate of Mixon v.</u> <u>United States</u>, <u>supra</u> at 405; see also <u>Stinnett's Pontiac Serv.,</u> <u>Inc. v. Commissioner</u>, <u>supra</u> at 638-639.  Gandy's controller testified that repayment of the advances from petitioner was contingent on the company's making a profit.  Similarly, petitioner testified that in order for his advances to be repaid, Gandy's had to operate successfully.

This factor weighs toward equity.

4. Right To Enforce Payment

A definite obligation to repay principal and interest weighs toward debt. See Stinnett's Pontiac Serv., Inc. v. Commissioner, supra at 639. Repayment that is within the discretion of the parties and not conditioned upon the occurrence of certain events weighs toward equity. See id. Even where there is a basic right to enforce payment, failure to take customary steps to ensure payment--such as securing the advance or establishing a sinking fund--weighs toward equity. See In re Lane, 742 F.2d at 1317.

As far as the record reveals, Gandy's had no fixed obligation to repay the two 1993 advances of $25,000 each. With regard to the other five advances, even if we were to assume arguendo that petitioner had a basic right to enforce payment, petitioner made no effort to do so and failed to take customary steps to ensure payment. The advances were unsecured. There is no evidence that any sinking fund was established by which the principal and interest could be paid. In short, the record does not establish that the parties expected Gandy's to repay the advances.

This factor weighs toward equity.

5. Increased Participation in Management

An increase in the nominal creditor's participation in management of the nominal debtor as a result of the advance weighs toward equity. See Stinnett's Pontiac Serv., Inc. v.

<u>Commissioner</u>, <u>supra</u> at 639.  The record is inadequate for us to evaluate whether petitioner's management interest in Gandy's increased as a result of his advances.

This factor is neutral, and we give it no weight.

6.  <u>Status of the Contributions in Relation to Regular Corporate Creditors</u>

Subordination of repayment of an advance to other indebtedness weighs toward equity.  See <u>Estate of Mixon v. United States</u>, 464 F.2d at 406.  Petitioner's advances were subordinated to the Gandy's bonds.  Moreover, despite advancing Gandy's more than $360,000 in 1990 and 1993, petitioner received only a token payment of $5,000 at the end of 1993.  Gandy's controller testified that petitioner's advances were used to pay Gandy's suppliers--suggesting a de facto subordination of petitioner's advances to these creditors.

This factor weighs toward equity.

7.  <u>The Parties' Intent</u>

Although the parties' intent is relevant, the "subjective intent on the part of an actor will not alter the relationship or duties created by an otherwise objectively indicated intent." <u>Id.</u> at 407.  The parties' stated intent is not necessarily conclusive of the parties' true intent as revealed by the objective facts.  See <u>In re Lane</u>, <u>supra</u> at 1316; <u>Tyler v. Tomlinson</u>, 414 F.2d 844, 850 (5th Cir. 1969).

Petitioner argues that he intended to make the loans in

furtherance of his trade or business of lending money, in order to make Gandy's profitable so as to help his investment banking business prosper.  The objective facts in the record, however, do not support the conclusion that these advances were made in a manner consistent with normal lending practices or consistent with petitioner's own practices in making loans to other, unrelated borrowers.  Although petitioner testified that he intended the advances to be repaid, the record does not reveal that he made any efforts to collect principal or interest on the advances over a period of 2 to 3 years.  Petitioner was aware of Gandy's perilous financial situation when he first made the advances in issue and could not realistically have expected to be repaid, especially in light of Gandy's delinquency on the Gandy's bonds, to which his advances were subordinated.  He acknowledged that he made the 1990 advances on an unsecured basis at a time when Gandy's needed the advances to operate.  He made three further unsecured advances in 1993, without having received or requested repayment of the overdue 1990 advances, and in two instances without receiving any kind of debt instrument.

This factor weighs toward equity.

8.  Thin or Adequate Capitalization

Advances to corporations are generally indicative of equity where the corporation is thinly capitalized (i.e., has a high ratio of debt to equity).  See Stinnett's Pontiac Serv., Inc. v.

Commissioner, 730 F.2d 634, 638-639 (11th Cir. 1984); Estate of Mixon v. United States, supra at 408.  Gandy's controller testified that when petitioner made the advances in question, Gandy's debts far exceeded its equity.

This factor weighs toward equity.

9.  Identity of Interests Between Creditor and Shareholder

If stockholders make advances in proportion to their stock ownership, a capital contribution is indicated.  See Estate of Mixon v. United States, supra at 409.  Petitioner argues that his advances to Gandy's were not proportional to his ownership interests since he made all the advances and Gandy's had other shareholders.  The only other shareholders, however, were corporations that he and Philip wholly owned and of which petitioner was the majority shareholder, thereby weakening if not negating any significance otherwise accorded to a lack of proportionality.  See Slappey Drive Indus. Park v. United States, 561 F.2d 572, 584 (5th Cir. 1977) ("Because shareholding family members were thus less likely to attribute major significance to departures from strict equality in their positions, the instances of disproportionate debt and equity holdings provide a much weaker inference than they ordinarily would that the ostensible debt was in fact what it purported to be").

This factor is neutral, and we give it no weight.[13]

10.  Source of Interest Payments

"[A] true lender is concerned with interest."  Curry v.
United States, 396 F.2d 630, 634 (5th Cir. 1968).  Failure of the
putative lender to insist on interest payments suggests that he
is instead interested in the future earnings of the corporation
or increased market value of his ownership interest, thereby
indicating equity contributions.  See Stinnett's Pontiac Serv.,
Inc. v. Commissioner, supra at 640.  Petitioner never demanded,
and Gandy's never made, interest payments on the advances.

This factor weighs toward equity.

11.  Ability To Obtain Funds From Outside Lenders

If a party receiving an advance can borrow funds from
another lender in an arm's-length transaction on similar terms,
the advance may appear to be debt.  See Electronic Modules Corp.
v. United States, 695 F.2d 1367, 1370 (Fed. Cir. 1982); Estate of
Mixon v. United States, supra at 410.  Petitioner alleges to have
made completely unsecured loans to Gandy's at a time when all its
assets were completely leveraged and when it was deeply

---

[13]  To the extent that petitioner, as majority shareholder
and father of the sole minority shareholder, controlled the
corporations that held ownership interests in Gandy's (and there
is no evidence to the contrary), we could also conclude that
there was identity of interest between petitioner and the other
shareholders--a factor that would weigh strongly toward treating
the advances as equity.  Cf. Plantation Patterns, Inc. v.
Commissioner, 462 F.2d 712, 722 (5th Cir. 1972).

encumbered by delinquent debt on the Gandy's bonds.  Petitioner allegedly relied upon uncertain future earnings for repayment and generally insisted upon no fixed schedule for repayment.  We are unpersuaded that any unrelated third party would have made loans to Gandy's on these terms and in these circumstances.  Indeed, Gandy's controller testified that when petitioner made the advances, Gandy's could not have obtained financing from any other financial institution.[14]

This factor weighs toward equity.

12.  Extent To Which the Advances Were Used To Acquire Capital Assets

The use of a shareholder's advances to pay day-to-day operating expenses, rather than to acquire capital assets, tends to indicate that the advances are bona fide indebtedness.  See Stinnett's Pontiac Serv., Inc. v. Commissioner, supra at 639; Estate of Mixon v. United States, 464 F.2d at 410.  Gandy's used the advances as working capital to meet day-to-day operating expenses.

This factor weighs toward debt.

---

[14] In support of its argument that Gandy's could obtain financing from other sources, petitioner cites the controller's testimony that during 1991 and 1992, Gandy's factored its accounts receivable with a factoring company.  This testimony does not establish, however, that the factoring company would have made unsecured loans to Gandy's on terms similar to those that pertained to petitioner's advances.

13.  <u>The Failure of the Debtor To Repay on the Due Date</u>

This factor is the most telling of the <u>Mixon</u> factors.  See <u>In re Lane</u>, 742 F.2d at 1317.  Except for a token $5,000 repayment at the end of 1993, Gandy's repaid none of the advances, nor did petitioner ever demand repayment.  We conclude that petitioner never intended to compel repayment of the advances.  Cf. <u>Stinnett's Pontiac Serv., Inc. v. Commissioner</u>, <u>supra</u> at 640.

This factor weighs strongly toward equity.

<u>Conclusion</u>

In light of the foregoing, we conclude and hold that petitioner's advances to Gandy's were capital contributions and not bona fide debt.  Therefore, petitioner may not deduct the advances as bad debts under section 166.

D.  <u>Characterization of Petitioner's Losses as Ordinary or Capital</u>

Petitioners argue that even if petitioner's advances to Gandy's constituted capital contributions rather than bona fide indebtedness, they are nevertheless entitled to claim ordinary losses under section 165 rather than the capital losses to which respondent has conceded they are entitled, because petitioner was in the business of lending money and because his initial involvement with Gandy's came in furtherance of his business rather than as an investment.  In support of their position, petitioners cite <u>W.W. Windle Co. v. Commissioner</u>, 65 T.C. 694

(1976) and various other cases for the proposition that ordinary loss treatment may be permitted with respect to assets that were acquired for a business purpose rather than for an investment purpose.

A loss from the sale or exchange of a capital asset is generally subject to section 1211(a), which limits the amount of the loss allowed. See sec. 165(a). Section 1221 generally defines "capital asset" as "property held by the taxpayer (whether or not connected with his trade or business)", but specifically excludes five classes of assets. The cases cited and relied upon by petitioners were all decided under the doctrine of Corn Prods. Refining Co. v. Commissioner, 350 U.S. 46 (1955), in which the Supreme Court appeared to recognize a nonstatutory exception to the section 1221 definition of capital asset, in holding that certain futures contracts acquired and held for a business purpose qualified as a noncapital asset. In Arkansas Best Corp. v. Commissioner, 485 U.S. 212, 223 (1988), however, the Supreme Court called into question the continuing vitality of many of the cases that had been decided under the Corn Products doctrine, stating that "a taxpayer's motivation in purchasing an asset is irrelevant to the question whether the asset is 'property held by a taxpayer (whether or not connected with his business)' and is thus within § 1221's general definition of 'capital asset.'"

Petitioners do not argue, and the facts do not indicate, that petitioner's ownership interest in Gandy's qualifies for any of the section 1221 exclusions from the definition of capital assets.  Notwithstanding that petitioner was in the business of lending money, and regardless of the purpose for which he initially acquired the stock, his ownership interest in Gandy's was a capital asset as generally defined in section 1221.

Accordingly, we conclude, pursuant to respondent's concession, that petitioner's advances to Gandy's resulted in long-term capital losses, deductible pursuant to the limitations of section 1211(b).

To reflect the foregoing and concessions by the parties,

<u>Decision will be entered under Rule 155</u>.